# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 24, 2012 Session

## STATE OF TENNESSEE v. RAYNELLA DOSSETT LEATH

**Appeal from the Criminal Court for Knox County**
**No. 85787      Richard R. Baumgartner, Judge**

---

**No. E2011-00437-CCA-R3-CD - Filed June 3, 2013**

---

Following a jury trial, the Defendant, Raynella Dossett Leath, was convicted of first degree premeditated murder and sentenced to imprisonment for life, with the possibility of parole. See Tenn. Code Ann. § 39-13-202. In this appeal as of right, the Defendant contends (1) that she was retried in violation of her state and federal constitutional protections against double jeopardy; (2) that the trial court erred by declining to exclude test results from analysis of the victim's blood and urine; (3) that the trial court erred by admitting "certain estate planning documents" into evidence at trial; (4) that the trial court erred by denying the Defendant's motion for a mistrial after a witness testified that she had previously stated that she was "scared" of the Defendant; (5) that the evidence was insufficient to sustain the Defendant's conviction for first degree premeditated murder; (6) that the trial court erred by failing to instruct the jury on the State's duty to preserve evidence pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (7) that the trial court's jury instruction regarding the defense of alibi improperly shifted the burden of proof onto the Defendant; (8) that the trial court erred by failing to instruct the jury on the Defendant's "theory of defense"; (9) that the trial court used an improper method to select the alternate juror; (10) that members of the jury committed misconduct by deliberating prematurely and reviewing extraneous prejudicial information; (11) that the State withheld evidence favorable to the Defendant in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; (12) that the Defendant is entitled to a new trial based upon newly discovered evidence; (13) that the trial court, by accepting the jury's guilty verdict, "abdicated" its role as the thirteenth juror; and (14) that the Defendant is entitled to a new trial based upon cumulative error.[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

---

[1]For the purposes of clarity and brevity, we have renumbered and reordered the issues as stated by the Defendant in her brief.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

James A. H. Bell, Knoxville, Tennessee (at trial and on appeal); John Wesley Hall, Little Rock, Arkansas (on appeal); Paula R. Ham, Loudon, Tennessee (at trial); Richard L. Holcomb, Honolulu, Hawaii (at trial), for the appellant, Raynella Dossett Leath.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Robert Steven Bebb, District Attorney General, pro tem; and Richard A. Fisher, Cindy LeCroy-Schemel, and Joseph Y. McCoin, Assistant District Attorneys General, pro tem, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[2]

*I. State's Evidence*

*A. Police Investigation*

Shortly before 11:30 a.m. on March 13, 2003, the Knox County Emergency Communications District received a 911 call from a residence belonging to the Defendant and her husband, David Leath. When the 911 operator answered the phone call, the Defendant repeatedly asked the operator to help her before telling the operator that her husband "shot himself." The operator asked the Defendant where her husband was located, and the Defendant stated that he was "in the bed." The Defendant implored the operator to "please hurry" and stated that she was "going to vomit." The Defendant then began screaming incoherently and crying for a few brief moments. After that, the telephone line remained open, but the Defendant did not respond to the 911 operator and could no longer be heard in the background.

Sergeant David Amburn of the Knox County Sheriff's Office (KCSO) testified at trial that he and Assistant Chief Deputy L. Keith Lyon[3] were the first officers to arrive at the

---

[2]This case has a long and complex procedural history. The victim was killed in March 2003. The Defendant was not indicted until November 2006. The Defendant was first tried from March 2 to 12, 2009. However, that trial resulted in a mistrial. Numerous pre- and post-trial motions were filed involving the second trial. This section will discuss only the factual background regarding the Defendant's conviction. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

[3]Chief Lyon was killed in an automobile collision several years prior to the Defendant's trial.

Defendant's residence. When they arrived, the front door "was standing open," and the Defendant was lying face down in the front yard "motionless" and not making any sounds. Sgt. Amburn "nudged [the Defendant] with [his] foot" and said, "Ma'am." The Defendant then "started crying heavily" to the point where she "couldn't catch her breath." Sgt. Amburn helped the Defendant up, and she "started yelling uncontrollably." Sgt. Amburn recalled at trial that the Defendant "had some kind of hand towel . . . that she might have been sobbing with." However, Sgt. Amburn could not remember if the Defendant "had any blood on her."

Sgt. Amburn testified that, after he got the Defendant up, she "was totally out of it," "really uncontrollable," and "was very hysterical." Sgt. Amburn recalled that the Defendant asked him to help her husband, told him that her husband had been shot, and told him where her husband was before she started saying "[s]ome stuff that didn't make sense." Sgt. Amburn testified that nothing about the Defendant's behavior seemed "disingenuous" at the time, and he later described the Defendant in his report as having been "overcome by grief." Sgt. Amburn and Chief Lyon then left the Defendant in the front yard "unattended" as they entered the house to check on the victim.

Sgt. Amburn and Chief Lyon went inside and began "to clear the residence." Sgt. Amburn recalled that the house was "very dark," especially in the bedroom where the victim was found. Sgt. Amburn testified that he and Chief Lyon tried "not to disturb anything at all" in the bedroom as they checked on the victim. The victim was lying on his side with a pillow underneath his head and blankets tucked in around his body. Sgt. Amburn testified that it was obvious from looking at the victim that he was deceased. There was a revolver near the victim's hand and pointing away from the victim's head. Sgt. Amburn recalled that there was a "TV tray . . . with maybe a bowl of what looked like oatmeal or something in it, like he'd eaten in the bed earlier." Sgt. Amburn testified that he and Chief Lyon then backed out of the bedroom and "checked the rest of the residence to make sure" the Defendant was the only other person there.

Sgt. Amburn testified that he and Chief Lyon "cleared" the entire house, checking all of the rooms, closets, and under the beds. Sgt. Amburn could not recall how long it took to check the entire house. When Sgt. Amburn and Chief Lyon had finished, there were other officers at the front door, and the Defendant had been moved from the yard to the front porch. Sgt. Amburn testified that neither he nor Chief Lyon entered the house alone, and he was certain about their actions that day. Sgt. Amburn also recalled that the Defendant's vehicle felt "lukewarm," like it had been driven sometime "in the last couple of hours."

Sgt. Robert D. Lee of the KCSO arrived at the Defendant's residence shortly after Sgt. Amburn and Chief Lyon. However, Sgt. Lee recalled events differently from Sgt. Amburn.

According to Sgt. Lee, Chief Lyon was alone in the foyer of the house while Sgt. Amburn was with the Defendant in the front yard. Sgt. Lee recalled that the Defendant appeared to be "pretty upset." According to Sgt. Lee, he rushed into the house because he thought it was tactically unsound for Chief Lyon to be alone in the house. Sgt. Lee testified that he and Chief Lyon then went into the bedroom, checked on the victim, "cleared" the room, and then backed out and waited on the paramedics to arrive. Sgt. Lee recalled that the blood on the victim "was jelled." Both Sgt. Lee and Sgt. Amburn testified that to their knowledge, no one moved the victim's body or touched the gun.

Sgt. Lee testified that he "secured the scene" and stationed himself at the front door. Sgt. Lee started a "crime scene log" to keep track of everyone who entered the Defendant's house that afternoon. Sgt. Lee testified that Chief Lyon walked the paramedics into the bedroom and that they confirmed that the victim was dead. Sgt. Lee recalled that there were a lot of people on the Defendant's property that afternoon, including approximately thirty "civilians" who congregated at a barn near the residence. However, Sgt. Lee testified that none of these "civilians" were allowed into the Defendant's house or near the crime scene.

Detective Sergeant Perry Moyers of the KCSO testified at trial that he was the lead detective in this case. When Det. Moyers arrived at the Defendant's home, Chief Lyon and Sgts. Amburn and Lee gave him a "quick" assessment of the situation. Det. Moyers was told that nobody had touched anything and "that everything was as it was when [they] got there." Det. Moyers noticed a bullet hole in the headboard of the victim's bed. The bed was later removed, and a bullet was recovered from the wall, approximately twenty inches above the floor. There was also a bullet hole in the mattress near the victim's body and the gun. Bullet fragments were later recovered from the bed frame and underneath the bed.

Det. Moyers observed that the victim had an entrance wound just above his left eyebrow. The victim's body was lying on his right side with his right arm outstretched and the gun was "right next to" his left hand. Det. Moyers noted that lividity, the settling of blood in the lower portions of the body after death, had begun to set in, but had not yet become "fixed." Det. Moyers opined that this meant the victim had been dead for more than thirty minutes but less than five or six hours. The blood had started to pool on the bed and the floor beneath it. Det. Moyers recalled that the blood on the victim and the bed appeared to be dried except for some blood still pouring out of the victim's nose. There was a pillow "between [the victim's] head and his shoulder." The victim also had sheets "tucked in around him up and down." There was no blood on the left side of the bed.

The gun found next to the victim's body was a Colt .38 caliber "police special" revolver. Det. Moyers removed the gun from the victim's bed. Upon visual inspection, there were no signs on the gun of "blow back," blood spatter and material that sprays when a

person is shot while the barrel of the gun is in contact with the skin or from a very close range. Det. Moyers opened the gun's cylinder and was careful to insure that the cylinder did not move when he opened it. The cylinder contained three live rounds and three spent shell casings. The cylinder rotated clockwise, and at the top of the cylinder was a spent Western shell casing, then two spent Remington shell casings, one live Remington round, and two live Western rounds. No fingerprints were found on the gun and the live rounds, spent casings, and spent bullets were not tested for fingerprints.

There were no signs that there had been a struggle in the victim's bedroom, but Det. Moyers testified that based upon the evidence at the scene, he began to suspect the victim's death was not a suicide. Det. Moyers believed that the blood spatter on the wall was not consistent with the victim's having been shot where his body was lying. Measurements and photographs of the blood spatter were taken for later analysis. Det. Moyers also noticed that the gunpowder around the bullet hole in the mattress appeared to be undisturbed. Based upon this, Det. Moyers concluded that the victim's body was in the position it was found in and the sheets were tucked in around the body before the shot was fired into the mattress. Samples were taken from the hands of both the Defendant and the victim to test for gun shot residue. The Defendant also gave Det. Moyers the clothes she and her daughter had been wearing that day for forensic tests to be performed.

Three latex gloves were found on a shelf over a toilet in a bathroom adjoined to the victim's bedroom. An open Bible was also found on a counter near the sink in the bathroom. The police did not search any other rooms in the house besides the bedroom and the adjacent bathroom. The police did check the house for signs of a break-in because the Defendant told Det. Moyers that she had "secured the place" before she left and that "when she came back home, it was still secure." There were no signs of a break-in, but none of the KCSO officers who testified at trial recalled checking to make sure the doors were actually locked. The Defendant originally told Det. Moyers that "she did not know where the gun came from" or who it belonged to, but she later told Det. Moyers that she thought the gun had belonged to the victim's deceased father.

Det. Moyers was told that the victim "had some medical problems" and was depressed because his mother had a terminal illness. When Det. Moyers asked the Defendant for the name of the victim's doctor, she voluntarily gave Det. Moyers an appointment calender that had "information for the doctor appointments and stuff." The calender had numerous entries, not all of them pertaining to the victim. There were several entries from the end of January to March 8, 2003, in which the Defendant described the victim as being "hateful," "controlling," and "paranoid." The Defendant also stated in a couple of entries that the victim had "stayed in bed all day" or that he had made her cry.

In an entry dated March 8, 2003, the Defendant stated that the victim had "slurred speech," was "hateful," and had "stayed in bed all day." The victim's daughter, Cindy Wilkerson, testified that on March 8, 2003, the Defendant and the victim had gotten into an argument about "feeding the cows" and that the Defendant told her that "she was going to teach [the victim] a F'ing [sic] thing." However, the victim's neighbor, Roger Yarnell, testified that he had never witnessed any problems between the victim and the Defendant.

At trial, several witnesses described the victim as having been "laid-back," "carefree," and "a fun-loving guy." Friends and family of the victim testified that they observed no deterioration in the victim's mental or physical health in the months before his death. However, it was established at trial that the victim was a private man who seldom spoke about his health or personal matters. The victim's neighbor, Mr. Yarnell, also testified that the victim was "[v]ery emotional" about his mother's ill health. Mr. Yarnell testified that he was supposed to meet with the victim to pick up some mulch around noon on March 13, 2003. According to Mr. Yarnell, the victim was always on time and had never called off a meeting before.

Ms. Wilkerson testified that she had a strained relationship with the Defendant and that the Defendant "was always distant" towards her. Due to their poor relationship, Ms. Wilkerson thought it was extremely odd when the Defendant called her at work just before 10:00 a.m. on March 13, 2003. Ms. Wilkerson testified at trial that the Defendant had "never called [her] at work" before. Ms. Wilkerson worked at the same barbershop as the victim, and the Defendant asked her if the victim had "stopped by to talk to [her]." Ms. Wilkerson told the Defendant that she had not spoken to the victim that morning, and the Defendant said that the victim "didn't eat his oatmeal [that] morning" and that she guessed "he was just going to go work out on an empty stomach." Ms. Wilkerson testified that the Defendant told her she was at the hospital visting the victim's mother, Mayme Leath, and bringing her some flowers from Mrs. Leath's home. The Defendant then put Mrs. Leath on the line, and Ms. Wilkerson spoke to her briefly before hanging up to return to work.

Ms. Wilkerson testified that she thought something was "wrong" and that "something just wasn't right about the conversation." Ms. Wilkerson thought that the Defendant's voice "didn't sound right" and that she seemed too "chipper." Ms. Wilkerson testified that while she visited Mrs. Leath in the hospital every day, the Defendant rarely visited Mrs. Leath and had never brought her flowers before. Ms. Wilkerson also testified that it was odd for the Defendant to be in a hospital because she had a "liver condition" and "wasn't supposed to be around any sick people." When the Defendant had to be in a hospital, she would wear a mask over her face. Ms. Wilkerson did not find out about her father's death until around 2:00 p.m. when the Defendant's son-in-law came to her barbershop and asked her to leave with him.

Ms. Wilkerson testified that when she got to the victim's house, the Defendant told her the victim "had committed suicide." Ms. Wilkerson asked the Defendant how the victim could have done that, and the Defendant responded, "Well, he killed cows." Ms. Wilkerson testified that her father "would never have hurt his face . . . [and] would have been afraid that he would have been a vegetable." According to Ms. Wilkerson, the gun used to kill the victim had belonged to the victim's father, and she had seen it, along with a holster, at Mrs. Leath's house several years before the victim's death. Gordon Armstrong, a friend of the victim's, testified that he also recognized the gun as having belonged to the victim's father because he had previously used the gun to kill a dog for the victim's family. Mr. Armstrong further testified that the victim had access to the gun, "but he wouldn't fool with it because he didn't like handguns."

James A. Safewright testified that he owned a "cremation company" and that he met with the Defendant on March 1, 2001. The Defendant met with Mr. Safewright by herself and paid in full to make "prearrangements" for the cremations of herself and the victim. Mr. Safewright recalled that the Defendant told him that the victim "had been in ill health." Mr. Safewright testified that the victim's body had been released to him after an autopsy was performed and that he cremated the body March 14, 2003. Mr. Safewright also testified that the Defendant still had a valid contract with him to cremate her body upon her death.

Randall Carr testified that in 2003 he was the director of human resources at Parkwest Hospital. Mr. Carr testified that on March 19, 2003, he had a "pretty unusual" meeting with the Defendant. According to Mr. Carr, the Defendant came to the hospital that morning wearing "a clinical mask [] over her face," which she removed once she had been shown to a conference room. The Defendant had her daughter and a private investigator with her and was at the hospital because she had requested to interview several hospital employees. As one of the interviews was concluding, the Defendant "gave the impression that something had just popped into her mind."

Mr. Carr testified that the Defendant stated that she remembered meeting and speaking with a physical therapist who was working with Mrs. Leath on the morning of the victim's murder and "that must be noted in the medical records somewhere." The Defendant also stated that she remembered making a phone call to the victim "to cheer him up" in front of the physical therapist. Mr. Carr testified that the Defendant told him that the victim "didn't answer" and then she "started crying."

Mr. Carr testified that he checked Mrs. Leath's medical records, and the physical therapist made a notation "about seeing [the Defendant] that morning" at 9:53 a.m. on March 13, 2003. However, there were several entries in Mrs. Leath's chart at 9:53 a.m., and it was possible that the physical therapist met with Mrs. Leath earlier in the morning. Mr. Carr

testified that there were also references in Mrs. Leath's medical records to the Defendant's having previously discussed Mrs. Leath's care with hospital employees. Ms. Wilkerson testified that she was unaware that documents from the hospital showed that the Defendant had visited Mrs. Leath in the past and was involved in decisions about Mrs. Leath's care.

A few weeks after the victim's murder, Ms. Wilkerson found an empty holster in Mrs. Leath's underwear drawer. Ms. Wilkerson turned the holster over to Det. Moyers. Det. Moyers testified at trial that the gun found beside the victim fit inside the holster. The holster was tested for fingerprints, and four latent fingerprints were found but were not of sufficient quality to make an identification. Ms. Wilkerson testified that the Defendant had Mrs. Leath's pocketbook and house keys prior to the victim's murder. According to Ms. Wilkerson, the Defendant only visited Mrs. Leath in the hospital once after the victim's death, and that was to return Mrs. Leath's pocketbook and house keys. Ms. Wilkerson also testified that on March 20, 2003, the Defendant came to her barbershop and told her that Mrs. Leath was "no more than a neighbor to her, and that [Mrs. Leath] was [Ms. Wilkerson's] responsibility because [she] was next of kin." Mrs. Leath died approximately a month after the victim was killed.

Charles Child testified that he was a licensed attorney whose practice focused on "people problems" such as estate planning and family law. Mr. Child testified that the victim had been a long time client of his and that he had drafted wills for the victim and the Defendant. In 1993, after the victim married the Defendant, he had a will drafted which named the Defendant as the administrator of his estate and left all of his property to Mrs. Leath and Ms. Wilkerson. Mr. Child testified that in 1996, the victim had his previous will destroyed and had a new will drafted which left everything to the Defendant and gave Mrs. Leath a life estate in a portion of his real property. The will left nothing for Ms. Wilkerson. In 1996, the Defendant had a will drafted that mirrored the victim's, leaving her entire estate to him.

Mr. Child also testified about a series of three quitclaim deeds executed in 1999. Mr. Child testified that the documents appeared to have been self-drafted, and two of the deeds stated that they had been prepared by the Defendant. The deeds took real property that had been owned by the victim and the Defendant individually and transferred the property's ownership to the victim and the Defendant jointly. The deeds made the victim and the Defendant tenants by the entireties with a right of survivorship in the new joint property. Mr. Child explained that based upon the quitclaim deeds, if the victim died, the Defendant would become the sole owner of all the property covered under the quitclaim deeds. Mr. Child further explained that the quitclaim deeds ensured that the Defendant would inherit all of the victim's real property regardless of what was stated in the victim's will. However, Mr. Child

noted that the victim's will would control how the remaining portions of the victim's estate would be divided.

Mr. Child testified that he last saw the victim on February 4, 2003. The victim and the Defendant came to his office to discuss the victim's 1996 will. According to Mr. Child, the Defendant did not appear to be upset, but the victim was "agitated, emotional," and "upset" about the 1996 will. Mr. Child testified that the victim "had questions" about the 1996 will and spoke with Mr. Child about the will without the Defendant present. However, Mr. Child testified that the victim ultimately made no changes to his 1996 will and that he was unaware of any attempts by the victim himself to change the will. Mr. Child testified that he believed the victim wanted his estate governed by the will because the victim did not instruct him to alter or destroy the will. Mr. Child further testified that the victim was aware of what needed to be done in order to invalidate the 1996 will. According to Mr. Child, the victim's will was lost after his death, and only a copy remained. Mr. Child testified that if the victim died without a will, Ms. Wilkerson would have been entitled to a large portion of the victim's estate.

Ms. Wilkerson testified that the Defendant served as the administer of the victim's estate and that under the victim's will she received nothing and her children received a car and some heirlooms. Ms. Wilkerson admitted that her father never discussed his estate planning with her and that she had sued the Defendant to challenge the victim's will. The Defendant answered the lawsuit by claiming that Ms. Wilkerson had killed the victim.[4] Ms. Wilkerson testified that no one other than the Defendant had ever accused her of murdering her father.

*B. Forensic Evidence*

Doctor Darinka Mileusnic-Polchan, the chief medical examiner for Knox County and an expert in forensic pathology and toxicology, testified that on March 14, 2003, she performed an autopsy on the victim's body. Dr. Mileusnic-Polchan testified that the victim appeared to be "a well-built, well-groomed . . . individual who obviously took care of himself" and noted that "he had a quite a bit of hair spray in his hair." According to Dr. Mileusnic-Polchan, the cause of the victim's death "was a close-range gunshot wound" to the victim's forehead, above the left eyebrow. The entrance wound was "a tear-drop shape" suggesting that the bullet entered at "a slightly downward angle."

---

[4]Ms. Wilkerson's co-worker, Hoyt Vanosdale, testified that Ms. Wilkerson got to work around 7:00 a.m. on the day of the murder.

Dr. Mileusnic-Polchan testified that there was also "a widespread area of stippling or gunpowder tattooing" on the victim's forehead suggesting "the distance between the gunshot wound . . . and the muzzle was several inches." Dr. Mileusnic-Polchan compared the stippling on the victim's forehead to the results from forensic testing in which the gun found beside the victim was fired from several different distances. Dr. Mileusnic-Polchan concluded that the stippling on the victim's forehead matched the stippling pattern created when the gun was fired from twelve inches away from a target. Dr. Mileusnic-Polchan testified that the victim's wound was definitely not a contact wound. Dr. Mileusnic-Polchan further testified that forehead wounds were "extremely rare" in suicides and that it would be "even more rare" for it to be a suicide with a non-contact wound. It was also noted that the victim was right-handed and blind in his left eye.

Dr. Mileusnic-Polchan testified that the bullet entered the victim's skull, crossed through the left hemisphere of the victim's brain, and severed the victim's brain stem. After severing the brain stem, the bullet then "ricocheted inside the skull" before stopping inside the victim's brain. Dr. Mileusnic-Polchan recovered the spent bullet from the victim's brain during the autopsy. Dr. Mileusnic-Polchan testified that the victim's death was "pretty much instantaneous." Dr. Mileusnic-Polchan further testified that once the bullet severed the victim's brain stem, the victim was unable to move or pull the trigger of the gun. Dr. Mileusnic-Polchan was unable to determine an exact time of death, but she testified that the range for time of death "could be anywhere between just dead to about six hours." Given that there was evidence that "some cooling [had] already occurred" when the body was found, Dr. Mileusnic-Polchan narrowed the range to between "one or two hours to six hours."

Dr. Mileusnic-Polchan examined the victim's brain and found no evidence that the victim suffered from Alzheimer's disease. During the autopsy, Dr. Mileusnic-Polchan found that the victim's stomach was empty, but his bladder was full. Dr. Mileusnic-Polchan took samples of the victim's blood and urine to be tested for alcohol and drugs. There was no alcohol found in the victim's blood. However, the following drugs were found in the victim's blood: .08 micrograms per milliliter of Demerol; .16 micrograms per milliliter of Sinequan; and .05 micrograms per milliliter of Phenergan. Forensic testing also revealed that the victim had .08 micrograms per milliliter of norpethidine, a metabolite of Demerol, in his blood. All three drugs were prescription medications for which the victim did not have a prescription. There was no evidence at trial that any of these drugs were found in the Defendant's house or that the Defendant had access to these drugs.

Dr. Mileusnic-Polchan testified that Demerol is a sedative primarily used for short-term "moderate to severe pain control," usually for surgery. Dr. Mileusnic-Polchan further testified that the presence of the metabolite norpethidine was evidence of "chronic use" of

Demerol for at least "several days." According to Dr. Mileusnic-Polchan, Phenergan is also a sedative used to treat nausea, is frequently added to Demerol to increase its effect, and a combination of the two drugs is often used as a "sedative cocktail" prior to surgery. Dr. Mileusnic-Polchan testified that Sinequan is an antidepressant which, like Demerol and Phenergan, acts as a sedative. Dr. Mileusnic-Polchan further testified that the amount of Sinequan in the victim's blood was outside of the therapeutic range and was bordering on toxic levels. Dr. Mileusnic-Polchan opined that these three drugs taken together were a "very unsafe combination . . . to be used."

Dr. Mileusnic-Polchan testified that the combination of drugs in the victim's blood did not "make him completely unconscious," but caused the victim to be "really out of it" and "really impaired." Dr. Mileusnic-Polchan opined that based upon the level of drugs in the victim's blood, he could not have gotten out of bed that morning, gone to work, or driven a car. Dr. Mileusnic-Polchan testified that she did not know how the drugs got into the victim's system but theorized that they could have been mixed with food and ingested or injected into the victim. However, Dr. Mileusnic-Polchan did not find any needle marks on the victim's body. Dr. Mileusnic-Polchan testified that the victim could have ingested the drugs with "relatively light food" the night before his death and still have had an empty stomach at the autopsy. Based upon the evidence from the autopsy and forensic analysis of the victim's blood, Dr. Mileusnic-Polchan concluded that the victim's death was a homicide rather than a suicide.

Paulette Sutton, a retired forensic scientist and an expert in "blood stain pattern analysis," testified that she reviewed photographs of the crimes scene as well as photographs and measurements of the blood spatter on the bedroom wall. Ms. Sutton testified that based upon the evidence she reviewed, the victim was found "lying on his side with the right arm outstretched, the left arm bent at an angle." The entrance wound above the victim's left eyebrow was the source of the blood found in the bedroom. Ms. Sutton further testified that there was evidence of two other gunshots: one that was fired into the headboard of the bed and another that was fired into the mattress of the bed.

Ms. Sutton opined that the gunshot into the headboard was fired before the fatal gunshot to the victim's forehead. Ms. Sutton explained that strands of the victim's hair were found in the splinters caused by the bullet hole in the headboard, which meant that a bullet was fired into the headboard "and then the hair [came] down into it and [caught on] it." Ms. Sutton testified that once the victim was shot, blood traveled "upward and to the left" striking the wall at a ninety degree angle. Ms. Sutton further testified that blood spatter was found on the headboard and on the wall right above it. Based upon this evidence, Ms. Sutton opined that the victim was "in a raised position" with his head near the top of the headboard when he was shot. Ms. Sutton testified that once shot, the victim's body would have dropped

-11-

"straight down." Ms. Sutton concluded that the blood spatter was inconsistent with the victim's having been shot in the position his body was found in "or in a low position close to lying down." Ms. Sutton also concluded based upon the evidence she reviewed that the victim's death was a homicide.

No blood was found on the clothes the Defendant gave to Det. Moyers for forensic testing. The three latex gloves found in the victim's bathroom also tested negatively for blood and gunshot residue, a combination of three chemical elements expelled when a gun is fired. However, the Defendant's DNA was found on the latex gloves. Joe Minor, a supervisor and forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that blood could have been removed from the clothing and the gloves by simply washing the items. Likewise, gunshot residue could have been removed from the gloves by washing them. Gunshot residue was found on the pillow beneath the victim's head and on the back of the victim's left hand. There was "a good distribution of elements on both the palms and the backs of both [of the victim's] hands," but all three elements were only found on the back of the victim's left hand. There was no evidence of gunshot residue on the Defendant's hands. However, Laura Hodges, a forensic scientist with the TBI, testified that gunshot residue can be removed from a person's hands simply by washing them.

Donald Carman, a special agent with the TBI and expert in ballistics, testified that he examined the Colt .38 caliber revolver found beside the victim, three live cartridges found in the revolver, three spent cartridges found in the revolver, a spent bullet recovered from the wall of the bedroom, a bullet fragment recovered from underneath the bed, and a spent bullet recovered from the victim's brain during the autopsy. A spent Western shell casing, two spent Remington shell casings, one live Remington round, and two live Western rounds were recovered from the cylinder of the revolver.

Agent Carman testified that the spent bullets recovered from the wall and the victim's brain were consistent with the characteristics of a Remington bullet and of having been fired from a Colt .38 caliber revolver. According to Agent Carman, the bullet fragment found underneath the bed was consistent with the characteristics of a Western bullet. Agent Carman testified that the shot fired into the mattress appeared to be a "loose contact" shot where the muzzle was just off the surface of the bed. Based upon the position of the Western shell casing when the cylinder was opened, and the fact that the bullet fragment found under the bed was a Western bullet, Agent Carman opined that the gunshot into the mattress was fired after the gunshots into the headboard and the victim's forehead.

*II. Defendant's Evidence*

*A. Alibi Witnesses*

-12-

Barbara Sadler testified at trial that in 2003 she worked at Parkwest Hospital as a registered nurse and case manager. On March 13, 2003, Ms. Sadler was working on the "four-west" floor where Mrs. Leath was being treated. Ms. Sadler testified that she normally got to the "four-west" floor around 9:00 a.m. and that shortly after she arrived that morning the Defendant approached her. Ms. Sadler recalled that the Defendant was "teary-eyed" and upset because she did not want Mrs. Leath to be sent to a nursing home that day. Ms. Sadler testified that there was no social worker on the floor at that time, so she told the Defendant she would take care of Mrs. Leath. Ms. Sadler also recalled that the Defendant told her the victim "was home sick with high blood pressure" that morning. Ms. Sadler testified that she did not notice anything unusual about the Defendant's behavior that morning.

Ms. Sadler testified that on March 19, 2003, she gave a recorded statement to the Defendant and her private investigator. In the statement, Ms. Sadler told the investigator that she could not recall exactly when she saw the Defendant but that it was "sometime between 9:00 and 9:30 a.m." Ms. Sadler testified that she believed she saw the Defendant closer to 9:00 a.m. but admitted that it was "hard to remember exactly" what time it was. Ms. Sadler estimated that it would take someone ten minutes to get from the hospital's parking lot to "four-west." Ms. Sadler recalled that the Defendant was not wearing a face mask when she spoke to her on March 13, 2003. Ms. Sadler also testified that she could not recall seeing the Defendant visit Mrs. Leath prior to that morning.

Sergeant Thomas Fox of the Knoxville Police Department testified that he lived near the Defendant's property and that his wife and the Defendant were friends. Sgt. Fox testified that on the morning of March 13, 2003, he was going to his mailbox to get the newspaper when the Defendant drove up in her car. The Defendant stopped, rolled down her window, and said hello to Sgt. Fox. Sgt. Fox testified that he talked "briefly" with the Defendant that morning. Sgt. Fox characterized his conversation with the Defendant as "[j]ust small talk." Sgt. Fox testified that the Defendant was "in a good mood" and laughing during their conversation and that she did not seem upset or "teary-eyed." Sgt. Fox further testified that he did not notice anything suspicious about the Defendant's behavior.

Sgt. Fox could not recall which direction the Defendant drove off in. Sgt. Fox also could not recall what time it was when he spoke to the Defendant, but he believed it was sometime "later [in the] morning" around 10:00 or 11:00 a.m. Sgt. Fox testified that, due to his schedule, he did not go to his mailbox at the same time everyday and that his encounter with the Defendant seemed like an "inadvertent passing." Sgt. Fox also testified that the Defendant never stopped to speak with him at his mailbox before or after March 13, 2003. However, Sgt. Fox admitted that the Defendant had visited his wife several times since March 13, 2003.

Ann Troutman testified that on March 13, 2003, she was a guidance counselor at Karns High School (KHS). At that time, the Defendant's daughter Katie attended the school. Ms. Troutman testified that the Defendant and her daughters were very active at the school and that the Defendant was at the school quite often while her daughters were at KHS. According to Ms. Troutman, Katie called the Defendant that day around 10:15 a.m. to ask the Defendant to bring her some stomach medicine. Ms. Troutman testified that the Defendant arrived at the school around 11:00 a.m. and brought drinks for her and Katie. The Defendant stayed in Ms. Troutman's office for approximately fifteen minutes and "was friendly and pleasant." Ms. Troutman testified that nothing about the Defendant seemed unusual that morning.

Kathy Hobson testified that on March 13, 2003, she was a secretary at KHS. Ms. Hobson recalled the Defendant arriving at the school sometime between 10:30 and 11:00 a.m. The Defendant went to the guidance office and then came to the main office to speak with Ms. Hobson. Ms. Hobson testified that the Defendant "stood there quite a while and talked" to her and another secretary about several things. Ms. Hobson further testified that the Defendant seemed normal and was "happy, jovial" during their conversation.

*B. Remaining Witnesses*

Betty Lenoir testified that the Defendant and the victim attended the church pastored by her husband. Ms. Lenoir testified that the Defendant and the victim had "a normal relationship" and would regularly attend church together. Ms. Lenoir further testified that their relationship "appeared to be good." Ms. Lenoir recalled that she went to the victim's house on the day of his murder to comfort the Defendant. Ms. Lenoir also recalled that a few weeks after the victim's death, the Defendant spoke to the congregation. However, Ms. Lenoir could not recall what the Defendant said or if she said, "My name is Raynella Dossett, and I'll always be Ms. Dossett."

Raynella Magdelena Connatser testified that she was the Defendant's oldest daughter and had known the victim her entire life. Ms. Connatser testified that the Defendant did not kill the victim because "she loved him" and he "was the best person to her ever." Ms. Connatser told the jury that the victim was her godfather and that he and her father had been friends. Ms. Connatser explained that her father had died in 1992 and that the Defendant and the victim married in January 1993. Ms. Connatser testified that the victim was very loving to her and her siblings, that he had no enemies, and that he was "gentle and loving" to the Defendant. According to Ms. Connatser, the Defendant "loved taking care of" the victim and she could not recall the victim's ever fixing a meal for himself. Ms. Connatser testified that the victim supported her family when her eleven-year-old brother died in a car accident in 1994, and when the Defendant was diagnosed with breast cancer and had both of her breasts

-14-

removed in February 1999. When Ms. Connatser was married later that year, the victim walked her down the aisle and gave her away.

Ms. Connatser testified that on March 13, 2003, she was a student at the University of Tennessee when she was told that something was wrong at the Defendant's house. Ms. Connatser learned on her way to the Defendant's house that the victim had died. Ms. Connatser testified that when she pulled up to the Defendant's house "it was like a circus." Ms. Connatser recalled that the Defendant was on the front porch "holding a rag" and "kind of shaking." According to Ms. Connatser, Det. Moyers was talking to the Defendant, and "he was very focused." Ms. Connatser testified that Det. Moyers did not recognize the Defendant's "deteriorating condition." Ms. Connatser recalled that the Defendant "was having to be kind of supported by somebody, and she was shaking, and her eyes were glassed over, almost catatonic, and she was crying." Ms. Connatser testified that "after a number of minutes and [the Defendant] getting worse and worse," she feared that the Defendant was going to die. Ms. Connatser then "removed" the Defendant and took her to a hospital.

Det. Moyers recalled that there was talk that afternoon of sending the Defendant to a hospital because she was so distraught. Ms. Hobson testified that she drove Katie's car from the KHS parking lot to the Defendant's home that afternoon. As she was pulling onto the Defendant's property, Ms. Hobson saw the Defendant being driven away by Ms. Connatser. Ms. Hobson testified that the Defendant looked "close to being in shock," and she was "very upset [and] had been crying." Ms. Hobson also testified that after parking the car, she went into the Defendant's kitchen to leave some homework for Katie and that none of the police officers stopped her or made her sign anything.

Ms. Connatser testified that the Defendant stayed with her for two weeks after the victim's murder. According to Ms. Connatser, the Defendant "was a mess" while staying with her. Ms. Connatser testified that the Defendant "was glassy all the time . . . and sad and fragile." During that time, Ms. Connatser thought the Defendant "was going [to] die pretty soon." Ms. Connatser testified that most of the victim's things were "just sitting" on the Defendant's property and that the Defendant's house was like "a museum to sadness." According to Ms. Connatser, her father and her brother were buried on the Defendant's property, but Ms. Connatser did not know if the Defendant and the victim intended for the property to remain in the Dossett family or share it with Ms. Wilkerson and her family. Ms. Connatser testified that Mrs. Leath loved the Defendant, but she did not know if the Defendant regularly visited Mrs. Leath in the hospital.

*III. Verdict*

Based upon the foregoing evidence, the jury convicted the Defendant of first degree premeditated murder. The trial court imposed a sentence of life imprisonment, with the possibility of parole. The Defendant filed a timely motion for new trial and two amended motions for new trial. The trial court denied the Defendant's motion for new trial in a lengthy written order filed January 28, 2011. A few weeks later, the Defendant filed a motion to vacate the trial court's order. Following a hearing, Senior Judge Jon Kerry Blackwood, sitting by designation, denied the motion. The Defendant filed a timely notice of appeal, and this appeal followed.

## ANALYSIS

### I. Double Jeopardy

The Defendant contends that she was retried in violation of her federal and state constitutional protections against double jeopardy. The Defendant argues that the trial court improperly declared a mistrial in her original trial without following the procedures outlined in Tennessee Rule of Criminal Procedure 31(d)(2) to determine if the jury was unable to reach a verdict on the indicted offense, or if it had acquitted her of the indicted offense and was "hung" on a lesser-included offense. Because of this uncertainty, the Defendant argues that she should not have been retried for the indicted offense. The State responds that the Defendant acquiesced to the trial court's declaration of a mistrial and "cannot now establish a double jeopardy violation."

The Defendant was originally tried between March 2 and 12, 2009. After the jury had deliberated for approximately seven hours, they sent the trial court a note stating that they were "hung" and requesting further instructions from the trial court. When the trial court informed defense counsel of the jury's note, defense counsel stated, "It looks to me like you're at a mistrial." The trial court responded that it was not prepared to declare a mistrial at that time and recalled the jury into the courtroom to inquire if there was a possibility that they could reach a verdict after further deliberations.

The jury foreman stated that there were "philosophical difference[s]" between some jurors as to whether they needed "a smoking gun" in order to convict the Defendant. The jury foreman then stated that the jury was "very lopsided" and that he had been told "by the dissenting party that they [would] never change their mind" and "would not be satisfied unless there were . . . several eyewitnesses to the deed." The trial court asked the jury foreman if there was "room for further negotiation." The foreman told the trial court that the jury needed "a suggestion" as to what they should do. The trial court stated that its "preference" was for the jury to "work a little bit longer." The jury foreman stated that they would, and the jury was sent back to continue its deliberations.

After the jury left the courtroom, the Defendant immediately moved for a mistrial. The Defendant argued that the trial court's colloquy with the jury foreman "unreasonably single[d] out" and pressured the dissenters on the jury. The trial court denied the Defendant's motion. Later, the trial court received a note from the jury stating that they were "closer to a decisive, unanimous verdict" but that they wanted to break for the day. The Defendant renewed her motion for a mistrial, arguing that the jury felt "compelled to render a verdict." The trial court again denied the Defendant's motion but instructed the jury it did not "care if there [was] a verdict in this case" and that it did not want its comments to influence the jury's deliberations. The jury foreman assured the trial court that "[n]o one [had] been coerced in any way."

The next day, the Defendant filed a written motion for a mistrial outlining the same arguments made the previous day and stating that the jury had deliberated "for an unreasonable length of time." The trial court denied the motion for a third time. A few hours later, the trial court received a note from the jury stating that they were unable to reach a verdict. The jury returned to the courtroom, and the trial court addressed the jury, stating that it would declare a mistrial. At that point, defense counsel interrupted the trial court to thank the jury "very much for [their] hard work." The trial court then dismissed the jury. At no point during the proceedings did the trial court inquire as to whether the jury failed to reach a verdict on the indicted offense of first degree premeditated murder or on one of the lesser-included offenses, nor did the jury state which offense they were "hung" on.

At the time, the Defendant made no objection to the trial court's declaration of a mistrial or its dismissal of the jury. Approximately a month later, the Defendant filed a motion to dismiss the indictment against her arguing that the trial court failed to follow Tennessee Rule of Criminal Procedure 31(d)(2) and that retrial would violate her constitutional protections against double jeopardy. The trial court denied the Defendant's motion and her application for an interlocutory appeal. This court denied the Defendant's motion for an extraordinary appeal. The Defendant now raises this issue on direct appeal.

Both the federal and state constitutions protect a defendant from being "twice put in jeopardy of life or limb" for "the same offense." U.S. CONST. amend. V; TENN. CONST. art. 1, § 10. Our state constitutional provision has been interpreted identically to the federal constitution's prohibition against double jeopardy. State v. Houston, 328 S.W.3d 867, 875 (Tenn. Crim. App. 2010). The constitutional prohibition against double jeopardy also encompasses a defendant's "right to have [her] trial completed before a particular tribunal." Id. at 878 (quoting State v. Nash, 294 S.W.3d 541, 550 (Tenn. 2009)) (internal quotation marks omitted).

However, the prohibition against double jeopardy does not bar retrial when "there is a 'manifest necessity' for the declaration of [a] mistrial, regardless of the defendant's consent or objection." State v. Mounce, 859 S.W.2d 319, 321 (Tenn. 1993). "The impossibility of a jury reaching a verdict has long been recognized as a sufficient reason for declaring a mistrial." Id. at 321-22. But it is only a sufficient reason "when there is no feasible and just alternative to halting the proceedings that a manifest necessity is shown." Id. at 322. When a trial court improperly exercises its discretion and discharges a jury without a finding of manifest necessity, such a discharge is "tantamount to an acquittal." Houston, 328 S.W.3d at 880.

In this state, "sequential jury instructions" are given to the jury which "require a jury to consider [guilt] of the greatest charged offense before moving on to consider the lesser[-included] offenses." Tenn. R. Crim. P. 31, Advisory Comm'n Cmt. Due to the use of sequential jury instructions, when a jury "reports an inability to reach a verdict, it is not always apparent on which offense the jury disagreed." Id. "If the [trial] court grants a mistrial as to all offenses because of the jury's failure to reach agreement on a lesser[-included] offense, the double jeopardy clause is implicated if the jury actually acquitted the defendant of one or more of the greater offenses but disagreed on a lesser one." Id.

To prevent such a situation for occurring, Tennessee Rule of Criminal Procedure 31(d)(2) provides as follows:

> If the court instructs the jury on one or more lesser included offenses and the jury reports that it cannot unanimously agree on a verdict, the court shall address the foreperson and inquire whether there is disagreement as to the charged offense and each lesser offense on which the jury was instructed.

Rule 31(d)(2) then outlines a detailed procedure for trial courts to utilize in order to determine which offense a jury has deadlocked on.

Here, the trial court properly determined that the jury was hopelessly deadlocked and that a manifest necessity for a mistrial existed. However, there was no indication from the jury as to which charge they were deadlocked on, and the trial court failed to inquire whether the disagreement involved the indicted offense of first degree premeditated murder or one of the lesser-included offenses. As such, the trial court erred when it declared a mistrial and dismissed the jury without first engaging in the procedure outlined in Rule 31(d)(2). Nevertheless, the trial court's failure to follow Rule 31(d)(2) in this case did not bar the Defendant's retrial.

The prohibition against double jeopardy does not bar retrial "if the defendant consented to the termination of the proceeding at issue." Mounce, 859 S.W.2d at 321; see also State v. Huskey, 66 S.W.3d 905, 916 (Tenn. Crim. App. 2001) (stating that "double jeopardy does not bar a retrial when the defendant asks for a mistrial"). In such situations the defendant "has deliberately elected to forego [her] right to have guilt or innocence determined by the first trier of fact." Id. (quoting State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981)). Our supreme court has held that "when a defendant chooses not to object to the mistrial and give the trial court an opportunity to correct the error, consent may be inferred and, therefore, double jeopardy will not bar a subsequent prosecution." Id. at 323. However, before consent can be inferred from the defendant's silence, the "defendant must have a realistic opportunity to object, prior to a trial court's sua sponte declaration of a mistrial." Houston, 328 S.W.3d at 881 (quoting State v. Skelton, 77 S.W.3d 791, 800 (Tenn. Crim. App. 2001)).

The Defendant requested a mistrial three times, twice orally and once in a written motion, before the trial court ultimately declared a mistrial and dismissed the jury. It is clear from the record that the Defendant "deliberately elected to forego [her] right to have guilt or innocence determined by the first trier of fact." Mounce, 859 S.W.2d at 321. As such, the Defendant cannot now claim that the trial court lacked the manifest necessity required for the declaration of a mistrial. Nor can the Defendant claim that the prohibition against double jeopardy barred her retrial because the trial court failed to follow the procedures outlined in Rule 31(d)(2). The Defendant acquiesced in the trial court's failure to follow Rule 31(d)(2) by failing to object to the error.

The Defendant cites State v. Houston, 328 S.W.3d at 867, for the proposition that she did not acquiesce in the trial court's error because she did not have a meaningful opportunity to object. However, the facts in Houston are markedly different from the facts of this case. In Houston, the jury was dismissed without an actual declaration of a mistrial. Id. at 881 (stating that "where there has been no actual declaration of a mistrial, the defendant will not be held responsible for [her] failure to object to the termination of the proceedings"). Here, the possibility of a mistrial was discussed over a two-day period, during which the Defendant requested a mistrial on three separate occasions.

Furthermore, prior to declaring the mistrial and dismissing the jury, the trial court made lengthy remarks which defense counsel interrupted in order to thank the jury for its service. The Defendant had ample opportunity to object to the trial court's failure to follow Rule 31(d)(2) prior to the jury's dismissal but failed to do so. Accordingly we conclude that the Defendant consented to the declaration of a mistrial and acquiesced in the trial court's failure to follow Rule 31(d)(2). Therefore, the Defendant's retrial was not barred by the constitutional protections against double jeopardy.

-19-

## II. Admissibility of Test Results from Samples of the Victim's Blood and Urine

The Defendant contends that the trial court erred by denying her pre-trial motion to exclude test results from analysis of the victim's blood and urine. The Defendant argues that the State had a duty to preserve samples of the victim's blood and urine and that destruction of the samples warranted exclusion of the test results from the TBI's analysis of the samples pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). The Defendant further argues that the State was "grossly negligent" in the destruction of the samples and that the test results "formed an integral and important aspect" of the State's case against her. The State responds that exclusion of the test results was not warranted in this case because the samples were destroyed pursuant to TBI policy, and no evidence was presented to challenge "the accuracy of the results reached by the TBI . . . or the testing methods used."

During the victim's autopsy on March 14, 2003, samples of his blood and urine were taken to be tested for the presence of alcohol and narcotics. The samples were sent to the TBI, and the victim's blood tested positive for Demerol, Sinequan, and Phenergan. Jeff Crews, a special agent with the TBI and expert in toxicology, testified at trial that it was standard procedure to destroy blood and urine samples sixty days "after [the TBI] report goes out." Special Agent Crews testified that the samples in this case were destroyed on February 2, 2004. Special Agent Crews further testified that his report was sent to the medical examiner and the District Attorney General's office but that no notice was sent to the Defendant that the samples were to be destroyed. Special Agent Crews testified at trial that the narcotics found in the samples would normally degrade over time; therefore, it would be unlikely that tests on the samples several years later would have been accurate even if the samples had been preserved.

At the time the samples were destroyed, the Defendant had not been indicted for the victim's murder. After the Defendant was indicted in November 2006, she filed a motion to preserve all samples of the victim's blood. After learning that the samples had been destroyed, the Defendant filed a motion to exclude the test results from the TBI's analysis of the samples. The trial court concluded that the State had a duty to preserve the samples but that the test results would not be excluded because the samples had been destroyed pursuant to TBI policy, the evidence was not necessary to establish an element of the indicted offense, and the Defendant had not "challenged the sufficiency or accuracy of the TBI testing or procedures."

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. Ferguson, 2 S.W.3d at 915. In situations where evidence that the defendant maintains would have been exculpatory has been lost or destroyed by the State, trial courts

must determine whether a trial, conducted without the missing evidence, would be fundamentally fair. Id. at 914. The first step in this analysis "is to determine whether the State had a duty to preserve the evidence." Id. at 917.

Only if the proof establishes the existence of such a duty and that the State failed in that duty, will a trial court then conduct a balancing analysis involving the following factors: "1.) The degree of negligence involved; 2.) The significance of the destroyed evidence; considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3.) The sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917 (footnote omitted). After considering all of these factors, if the trial court concludes "that a trial without the missing evidence would not be fundamentally fair," it may dismiss the charges or "craft such orders as may be appropriate to protect the defendant's fair trial rights." Id.

We disagree with the trial court's conclusion that the State had a duty to preserve the victim's blood and urine samples. Generally, "the State has a duty to preserve all evidence subject to discovery and inspection under [Tennessee Rule of Criminal Procedure] 16, or other applicable law." Ferguson, 2 S.W.3d at 917. However, this duty is limited to constitutionally material evidence which "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

Furthermore, the duty to preserve evidence "does not extend to that which the State cannot preserve," such as evidence that is consumed during testing or is too dangerous to retain. State v. Tony Best, No. E2007-00296-CCA-R3-CD, 2008 WL 4367259, at *14 (Tenn. Crim. App. Sept. 25, 2008), perm. app. denied, (Tenn. Mar. 16, 2009). "It is common knowledge that human blood is perishable, and specimens of blood can only be maintained for a short period of time." State v. David Lynn Jordan, No. W2007-01272-CCA-R3-DD, 2009 WL 1607902, at *35 (Tenn. Crim. App. June 9, 2009), aff'd, 325 S.W.3d 1 (Tenn. 2010).

The samples of the victim's blood and urine were taken at his autopsy in March 2003. The Defendant did not request that the samples be preserved and provided to her for independent testing until after she was indicted in November 2006. Special Agent Crews testified at trial that the narcotics found in the samples would normally degrade over time, making it unlikely that tests conducted on the samples several years later would have produced accurate results. As such, the State had no duty to preserve the samples in this case. Moreover, even if the State had a duty to preserve the samples, the Defendant "has

-21-

failed to demonstrate that [her] right to a fair trial was affected by the destruction of the evidence." Jordan, 2009 WL 1607902, at *35.

The State did not act in bad faith in destroying the samples, as they were destroyed in accordance with established TBI policy and long before the Defendant was indicted in this case. Jordan, 2009 WL 1607902, at *35 (stating that the "mere loss or destruction of evidence does not constitute bad faith"). There was no evidence that the samples were improperly collected or tampered with, and the chain of custody was established at trial. More importantly, the Defendant has not presented any evidence to question or doubt the accuracy of the TBI's analysis of the samples. As such, "it cannot be said that evidence critical to the defense was excluded." Id. Accordingly, we affirm the trial court's denial of the Defendant's motion to exclude the test results.

### III. Admissibility of "Estate Planning" Documents

The Defendant contends that the trial court erred by denying her pre-trial motion to exclude evidence regarding her and the victim's "estate planning, wills, [and] quitclaim deeds." The Defendant argues that this evidence was irrelevant and that its probative value was substantially outweighed by the danger of unfair prejudice. The Defendant's chief argument is that this evidence could not be used to establish motive because the "quitclaim deeds . . . accomplished in life what their wills would have accomplished in death." The State responds that the trial court did not abuse its discretion in admitting this evidence because it was relevant to establish the Defendant's motive and was not unfairly prejudicial.

A determination regarding the relevancy of evidence "is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997)). Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403.

The "estate planning documents" introduced at trial established that the Defendant would inherit the victim's entire estate, to the exclusion of his daughter, upon his death. The quitclaim deeds established that the Defendant would become the sole owner of the victim's real property upon his death. The documents also established that the victim would have inherited all of the Defendant's estate, to the exclusion of her children, had she died before

him. The Defendant and the victim owned a large amount of real property which the Defendant stood to gain sole ownership of upon the victim's death. This evidence had the tendency to make the existence of the fact that the Defendant had a financial motive to kill the victim more probable than it would be without the evidence.

This evidence had significant probative value because it established a possible financial motive for the Defendant. There is nothing in the record before us to suggest that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. The Defendant's argument that the "quitclaim deeds . . . accomplished in life what their wills would have accomplished in death" is an attack on the weight and credibility of the evidence, which was for the jury to determine, and has nothing to do with the evidence's admissibility. See NEIL P. COHEN, SARAH Y. SHEPPEARD, & DONALD F. PAINE, TENNESSEE LAW OF EVIDENCE § 4.01[5][e] (6th ed. 2011) (stating that the trier of fact determines the weight to be given to a piece of evidence and in doing so the trier of fact "decides how convincing the evidence is in the context of the case"). Accordingly, we conclude that the trial court did not abuse its discretion in admitting the "estate planning" documents into evidence.

## *IV. 404(b) Evidence*

The Defendant contends that the trial court erred in denying her motion for a mistrial after a witness testified that she had previously stated that she was "scared" of the Defendant. The Defendant argues that the witness' statement was improper evidence of a prior bad act elicited in violation of Tennessee Rule of Evidence 404(b) and instilled "in the minds of the jury that [the Defendant] was a bad person to be feared." The State responds that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial because the witness' testimony that she was "scared" of the Defendant was "not clear and convincing evidence of a prior bad act."

Barbara Sadler was called as a defense witness during the trial and testified that she was a case manager and registered nurse at Parkwest Hospital. Ms. Sadler also testified that "for a couple of years" she worked "under [the Defendant's] leadership" when the Defendant was director of nursing at the hospital. On cross-examination, the prosecutor asked Ms. Sadler if she recalled telling Det. Moyers "that [she] was scared of" the Defendant. Ms. Sadler responded that she recalled "saying that and scared -- yes, [she] did say that." Defense counsel objected and moved for a mistrial, stating that Ms. Sadler's testimony was "clearly 404(b)." The trial court denied the Defendant's motion, stating that it did not believe that "somebody being scared of somebody is 404(b)." The State did not ask anymore questions of Ms. Sadler. On redirect examination, Ms. Sadler testified that the Defendant had never "done anything" to her and that she had never had any altercations with the Defendant.

The determination of whether to grant a mistrial lies within the sound discretion of the trial court and, as we alluded to above, should be granted "only in the event of a 'manifest necessity' that requires such action." State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). When determining whether a "manifest necessity" exists, "no abstract formula should be mechanically applied and all circumstances should be taken into account." Mounce, 859 S.W.2d at 322. "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). However, we agree with the State that Ms. Sadler's testimony that she had previously stated that she was "scared" of the Defendant was not evidence of a prior bad act. Ms. Sadler did not testify as to any prior acts committed by the Defendant, and her testimony, even at its most damaging, only created a mere inference of some possible, undefined prior bad act. See United States v. Harris, 165 F.3d 1062, 1066 (6th Cir. 1999) (arriving at a similar conclusion under Federal Rule of Evidence 404(b)); Haak v. State, 695 N.E.2d 944, 947 (Ind. 1998) (arriving at a similar conclusion under Indiana Rule of Evidence 404(b)). The State did not inquire any further about Ms. Sadler's statement after the Defendant's objection, and on redirect examination, Ms. Sadler testified that the Defendant had never "done anything" to her or had any altercations with her. Based upon the totality of the circumstances, we conclude that the trial court did not abuse its discretion when it denied the Defendant's motion for a mistrial following Ms. Sadler's testimony.

### V. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain her conviction for first degree premeditated murder. The Defendant argues that her conviction was based "entirely on speculation" and that the State failed to establish her identity as the perpetrator of the offense. The Defendant chiefly complains that the evidence produced at trial established that she left the victim's house "shortly after 8:30 [a.m.]," leaving a period of time too small for her to have killed the victim. While acknowledging that our supreme court has altered the standard by which the sufficiency of circumstantial evidence is judged in State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011), the Defendant nevertheless urges this court to apply the pre-Dorantes standard and argues that the State's evidence was not "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." The

State responds that the evidence, while circumstantial, was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all

plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences therefrom, the evidence at trial was sufficient to establish that the victim's death was a homicide. The victim was shot above his left eye from a distance of approximately twelve inches away. The victim was blind in his left eye, and Dr. Mileusnic-Polchan testified that it was "extremely rare" in suicides to find a non-contact forehead wound. The victim was also heavily sedated at the time of his death. The forensic evidence established that a gunshot was fired into the headboard of the bed, the victim raised his head to near the top of the headboard, was fatally shot, and his body fell straight down onto the bed. The victim's body was then moved and wrapped in bed sheets. The position of the victim's body did not match the blood splatter in the room. A third gunshot, which would

have been impossible for the victim to fire after he had been shot, was fired into the bed after the victim's body had been moved.

With respect to the Defendant's identity as the perpetrator of the offense, we begin by noting that the Defendant was the last person to see the victim alive and made the 911 call reporting the victim's death. That morning, the Defendant had made conflicting statements about where the victim was. The Defendant told Ms. Sadler that the victim "was home sick with high blood pressure," but she told Ms. Wilkerson that she expected the victim "to go work out" and possibly visit Ms. Wilkerson at work. The Defendant then repeatedly stated that the victim had killed himself. The Defendant told Det. Moyers that the victim "had some medical problems" and was depressed. The Defendant volunteered a calender to Det. Moyers in which she purported to document the victim's declining mental health. However, Dr. Mileusnic-Polchan testified that the victim was in good health and did not suffer from Alzheimer's disease. The Defendant had prepaid for the victim's cremation without the victim present, and the victim's body was cremated the day after the autopsy in accordance with that contract.

There was no evidence that the home had been broken into or that a struggle had occurred in the victim's bedroom. The victim had been sedated, possibly by having the drugs placed into his food. There was testimony at trial that the Defendant prepared all of the vicitm's meals. The murder weapon was identified as having belonged to the victim's father. The gun had been kept at Mrs. Leath's residence, which the Defendant had a key to, and an empty holster fitting the murder weapon was found there several weeks after the victim's death. The Defendant eventually told Det. Moyers that she believed the gun belonged to the victim's father. Witnesses testified that the victim did not like "handguns" and would not have shot himself in the face. Latex gloves which tested positive for the presence of the Defendant's DNA were found in the bathroom next to the bedroom where the victim's body was found.

The calender given to Det. Moyers by the Defendant had several entries that described the victim as "hateful" and "controlling." It also documented several fights between the Defendant and the victim in the months leading up to March 13, 2003. A few days before the murder, the Defendant told Ms. Wilkerson that "she was going to teach [the victim] a F'ing [sic] thing." Also, a month before the murder, the victim visited his attorney, Mr. Child, and was "agitated, emotional," and "upset" about his will. The victim spoke with Mr. Child alone about his will, but he made no changes. The victim's will gave his entire estate to the Defendant. Additionally, quitclaim deeds ensured that upon the victim's death, the Defendant would become the sole owner of all their real property.

Witnesses testified that the Defendant's actions on the morning of March 13, 2003, were unusual and out of character for her. The Defendant called Ms. Wilkerson that morning while Ms. Wilkerson was at work. Ms. Wilkerson testified that the Defendant had been "distant" towards her and "never called [her] at work." The Defendant told Ms. Wilkerson that she had gone to the hospital to take Mrs. Leath some flowers and told her that the victim "didn't eat his oatmeal" that morning. Ms. Wilkerson testified that the Defendant's voice "didn't sound right" and that she seemed too "chipper." The Defendant rarely visited Mrs. Leath in the hospital. The Defendant normally wore a face mask whenever she went to a hospital due to a liver condition, but on March 13, 2003, she visited Mrs. Leath in the hospital without a mask over her face. The Defendant also stopped to speak with her neighbor, Sgt. Fox, at his mailbox that morning. Sgt. Fox testified that the Defendant had never stopped to talk to him in his driveway before or after March 13, 2003.

A few weeks after the victim's death, the Defendant along with a private investigator went to Parkwest Hospital to interview several hospital employees. As one interview was concluding, the Defendant "gave the impression that something had just popped into her mind" and recalled that she had spoken to a physical therapist on March 13, 2003, and made a phone call to the victim in front of her. Ms. Wilkerson testified that the Defendant only visited Mrs. Leath in the hospital one time after the victim's death and that was to return Mrs. Leath's pocketbook and house keys. The Defendant eventually told Ms. Wilkerson that Mrs. Leath was "no more than a neighbor to her" and was Ms. Wilkerson's "responsibility" as the "next of kin."

The Defendant argues that she could not have killed the victim because there was too small a window of time for her to have committed the offense. The Defendant states in her brief that her daughter Katie left for school sometime between 8:00 and 8:15 a.m. that morning. However, there is no evidence in the record to establish what time Katie left for school. The record does establish that Katie was at school that morning. Additionally, the Defendant told Ms. Wilkerson that she had been in the house with victim and that he did not eat his breakfast. The Defendant argues that she must have left the house "shortly after 8:30 [a.m.]" in order to have stopped to get flowers, speak with Sgt. Fox, and arrive at Parkwest by 9:00 a.m. While this is a plausible inference that can be drawn from the evidence presented at trial, it is not the only plausible inference that may be established by the evidence.

Ms. Sadler testified that she could not remember exactly when she spoke to the Defendant on the "four-west" floor of Parkwest Hospital on March 13, 2003 but that she believed it was closer to 9:00 a.m. However, Ms. Sadler gave a recorded statement to the Defendant's private investigator that she saw the Defendant "sometime between 9:00 and 9:30 a.m." There was a notation in Mrs. Leath's medical records at 9:53 a.m. that morning

that the Defendant had spoken to a physical therapist. Likewise, Sgt. Fox testified that he believed he spoke to the Defendant sometime between 10:00 and 11:00 a.m. that morning and that he could not recall which direction she drove off in. Dr. Mileusnic-Polchan opined that the victim had been killed between "one or two hours to six hours" before the investigators arrived at the house shortly after 11:30 a.m.

The State was not required to rule out every hypothesis except that of the Defendant's guilt beyond a reasonable doubt. The Defendant's argument here would have this court accept all plausible inferences in her favor while ignoring the plausible inferences arising from the evidence that favor the State. Based upon the foregoing evidence, it was possible that the Defendant did not arrive at Parkwest Hospital on March 13, 2003, until 9:30 a.m. or later. The fact that the jury chose not to believe the Defendant's alibi does not cause its verdict to be suspect. See Williams, 657 S.W.2d at 410-11 (concluding that jury's decision not to believe alibi witnesses was within its province). As recognized by the Dorantes standard, the jury was in a better position than this court to weigh the evidence and decide between the competing plausible theories presented by the State and the Defendant.

The mere fact that the jury chose the State's plausible theory over that of the Defendant's does not justify overturning the jury's verdict. So long as the jury's verdict was supported by reasonable inferences drawn from the evidence, we are bound to uphold it against a challenge to the sufficiency of the evidence. See Sisk, 343 S.W.3d at 67; cf. State v. Chad Allen Love, No. E2010-01782-CCA-R3-CD, 2012 WL 391064, at *6-8 (Tenn. Crim. App. Feb. 8, 2012) (concluding that the defendant's identity as the alleged perpetrator of the crime could not be reasonably inferred from the evidence established at trial). Based upon the foregoing evidence, we conclude that a rational juror could reasonably infer the Defendant's identity as the perpetrator of the offense from the evidence presented at trial.

We also conclude that the evidence was sufficient to establish the elements of premeditation and intent. A shot was fired into the headboard of the victim's bed before the victim was shot in the forehead. The bullet severed the victim's brain stem, killing him instantly. The victim was unarmed, heavily sedated, and unable to defend himself. The gun used had belonged to the victim's father and had been taken from Mrs. Leath's home sometime before the murder. The victim's body was moved, a pillow was placed beneath his head, and sheets were tucked in around his body in an effort to make his death appear to be a suicide. The Defendant went to visit Mrs. Leath and called Ms. Wilkerson that morning, both actions that were unusual for her. Ms. Wilkerson recalled that the Defendant seemed too "chipper" and several witnesses testified that the Defendant seemed normal, friendly, and happy that morning. Having determined that the State established all the requisite elements of first degree premeditated murder, we conclude that the evidence was sufficient to sustain the Defendant's conviction.

## VI. Jury Instructions

### A. *Ferguson* Instruction

The Defendant contends that the trial court erred by failing to instruct the jury on the State's duty to preserve evidence pursuant to State v. Ferguson, 2 S.W.3d at 917 n.11. The Defendant argues that the Ferguson instruction should have been provided to the jury because the State destroyed samples of the victim's blood and urine prior to her being indicted for the victim's murder. The State responds that such an instruction was not warranted under the facts of this case. We have previously concluded that the State had no duty to preserve the samples taken from the victim, and, even if it did, the Defendant's right to a fair trial was not affected by the destruction of the samples. As such, we conclude that the trial court did not err in denying the Defendant's request for a Ferguson jury instruction.

### B. *Alibi Instruction*

The Defendant contends that the trial court's jury instruction regarding the defense of alibi improperly shifted the burden of proof. The Defendant argues that the use of the words "if believed" in the pattern jury instruction used by the trial court "improperly shifted the burden of proof" and suggested that she "had some affirmative duty to prove her alibi." The State responds that the instruction did not shift the burden of proof onto the Defendant because it explicitly stated that the burden was on the State "to prove beyond a reasonable doubt that the defendant was at the scene of the crime when it was committed."

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)).

In Christian v. State, our supreme court approved the following jury instruction for use when the facts of a case raise the defense of alibi:

> An alibi is defined as evidence which if believed would establish that the defendant was not present at the scene of the alleged crime when it allegedly occurred. If the defendant was not present when the crime was committed, [she] cannot be guilty.

> The burden is on the state to prove beyond a reasonable doubt that the defendant was at the scene of the crime when it was committed. If you find from your consideration of all the evidence that the state has failed to prove beyond a reasonable doubt that the defendant was at the scene of the crime when it was committed, you must find the defendant not guilty.

555 S.W.2d 863, 866 (Tenn. 1977) (emphasis added); see also T.P.I. Crim. 42.13.

Read in its entirety, it is clear that the alibi instruction used here did not improperly shift the burden of proof onto the Defendant. While the words "if believed" are used in the first part of the instruction, the second part makes clear that the burden of proof is on the State to prove beyond a reasonable doubt that the defendant was present at the commission of the offense. The second part of the instruction further elaborates that if the State fails to met its burden, then the jury should acquit the defendant.

The Defendant argues that her contention that the words "if believed" in the alibi instruction improperly shifted the burden of proof is supported by the fact that an "'if believed' jury instruction like Tennessee's was held to impermissibly shift the burden of proof" by the New York Court of Appeals. However, the jury instruction at issue in the case cited by the Defendant was not invalidated solely because it used the term "if believed." Instead, it was found to improperly shift the burden onto the defendant because it failed to state that the prosecution "had the burden of disproving the alibi beyond a reasonable doubt" in addition to using the words "if believed." People v. Hoke, 468 N.E.2d 677, 680 (N.Y. 1984); cf. Fox v. Mann, 71 F.3d 66, 71-72 (2nd Cir. 1995) (concluding that an alibi instruction which stated that the jury was to determine if alibi witnesses had testified truthfully did not shift the burden of proof where the instruction also emphasized that the prosecution had the burden of proof); Richard Murphy v. Kathleen Dennehy, No. 05-12246-DPW, 2007 WL 430754, at *12 (D. Mass. Feb. 5, 2007) (concluding that alibi instruction which stated "if you believe the defendant's alibi" did not shift the burden of proof because it also "made clear" that the prosecution "bore the burden on each essential element of the offense"). Accordingly, we conclude that trial court did not err in its use of the Christian alibi instruction.[5]

## C. "Theory of Defense" Instruction

---

[5]The Defendant also contends that the trial court's use of the Christian instruction constituted an improper comment on the evidence by the trial court. See State v. Suttles, 767 S.W.2d 403 (Tenn. 1989). However, there is nothing in the record to suggest that the trial court made any comment on the Defendant's alibi defense other than to read the pattern jury instruction approved by our supreme court in Christian. As such, we conclude that this issue is devoid of any merit.

The Defendant contends that the trial court erred by failing to instruct the jury on her "theory of defense." Prior to the trial court's instructing the jury, the Defendant orally moved the trial court to charge "the defense theory to the effect that the defense theory of the case [was] that the State [had] not proven the presence of the Defendant at the time of the offense, and that the Defendant did not kill the deceased." The State responds that the Defendant has waived this issue by failing to file a written request for the jury instruction. The State further responds that the trial court fully and fairly instructed the jury on the applicable law, including instructing the jury on the defense of alibi.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant failed to file a written request for a special jury instruction on her "theory of defense." See Tenn. R. Crim. P. 30(a); State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (stating that Rule 30 "envisions that such requests be made in writing" and that oral requests for instructions are not sufficient for an appellate court to place a trial court in error for rejecting a requested jury instruction). Additionally, the Defendant failed to include this issue in her motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated upon error in. . . jury instructions granted or refused, . . . unless the same was specifically stated in a motion for new trial"). Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

The doctrine of plain error only applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not appropriate here because the Defendant has failed to establish that consideration of the error is necessary to do substantial justice. The requested "theory of defense" jury instruction was nothing more than a restatement of the Defendant's alibi defense. As discussed above, the trial court gave an alibi instruction that correctly, fully, and fairly set forth the applicable law. Likewise, the trial court fully and fairly instructed the jury

on Defendant's presumption of innocence and the State's burden of proof. Accordingly, we conclude that plain error review is not warranted and that this issue is without merit.

*VII. Alternate Juror Selection*

The Defendant contends that the trial court used an improper method to select the alternate juror. The Defendant argues that a "plain and simple reading" of Tennessee Rule of Criminal Procedure 24(f)(2)(A) mandates that trial courts randomly select twelve names "to serve as the jurors to deliberate and the juror[s] not selected . . . shall be discharged." According to the Defendant, Rule 24(f)(2)(A) "does not say to pick one [juror] and send him or her home. It says to pick twelve and send the rest home." The State responds that the Defendant has waived this issue by failing to raise a contemporaneous objection to the trial court's method of selection and by failing to include this issue in her motion for new trial. The State further responds that the text of Rule 24(f)(2)(A) clearly belies the Defendant's argument.

After the close of the Defendant's proof, during a scheduling discussion regarding when the jury would begin its deliberations, defense counsel incorrectly stated to the trial court that Rule 24(f)(2)(A) required that the trial court "select by lot the names of the requisite number of jurors to -- to a body of twelve," meaning that the trial court would "pick twelve names out of the box, and whoever is left on the cutting room floor [would be] the alternate." The trial court responded that it had never selected alternate jurors in such a manner and that defense counsel had misinterpreted the rule. The trial court then read Rule 24(f)(2)(A) in its entirety to defense counsel and informed defense counsel that it would randomly select the name of the alternate juror. Defense counsel repeatedly stated that he was not "challenging" or "arguing" with the trial court's method of selecting the alternate juror. Instead, defense counsel stated that he was "just pointing [] out what the rule says." After instructing the jury, the trial court selected the alternate juror by randomly selecting his name from a bowl. The Defendant made no objection to the trial court's selection.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant failed to raise a contemporaneous objection during the trial court's selection of the alternate juror. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Likewise, the Defendant failed to raise this issue in her motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated upon . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial"). As such, we will only examine this issue to determine whether plain error review is appropriate.

Tennessee Rule of Criminal Procedure 24(f)(2) allows trial courts to choose between two methods to select and impanel alternate jurors. Here the trial court chose the single entity method, which is governed by Rule 24(f)(2)(A):

> During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number to reduce the jury to a body of twelve or such other numbers as the law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

(Emphasis added). The Advisory Commission Comment to Rule 24(f)(2)(A) further clarifies that "before the jury retires to deliberate the court will randomly deselect the additional jurors, leaving the desired number of jurors, ordinarily twelve. The deselected jurors are then discharged when the remaining jurors retire to deliberate." (Emphasis added).

The Defendant's argument runs counter to both the plain text of Rule 24(f)(2)(A) and the spirit of the rule, as expressed in the Advisory Commission Comment. Plain error review of this issue is not appropriate here because the Defendant has failed to establish that "a clear and unequivocal rule of law" has been breached. Page, 184 S.W.3d at 230. Accordingly, we conclude that this issue lacks any merit.

*VIII. Juror Misconduct*

The Defendant contends that members of the jury committed misconduct by deliberating prematurely and reviewing extraneous prejudicial information. The Defendant argues that the jurors began deliberating during the State's case-in-chief, that this was brought to the attention of a court officer, and that the court officer took no action and did not inform the trial court about this misconduct. The Defendant further argues that the alternate juror presented extraneous prejudicial information to the other members of the jury during the course of the trial. The State responds that "a fair reading" of the testimony given by the alternate juror at a post-trial hearing establishes that the jurors did not prematurely deliberate. The State further responds that the Defendant has failed to prove that the jury was exposed to extraneous prejudicial information.

After the jury convicted the Defendant, two private investigators employed by her interviewed the alternate juror, Joseph Brian Creech, and surreptitiously recorded their conversation. In the conversation, Mr. Creech stated that he had complained to the court officer that another juror "wouldn't deliberate" and was "making comments, just a comment

here or there getting all the buzz or something." The juror at issue was eventually excused from the jury due to a family emergency.

Mr. Creech also stated that after the jury returned its verdict, he "interviewed" the jurors about their decision. Mr. Creech told the investigators that several of the jurors thought a picture of the open Bible found in the victim's bathroom was "an eye-opener," "very critical," and "a transition point." Mr. Creech explained that the Bible was opened to Psalm 69 which "talk[ed] about preserving the inheritance of Israel . . . for the Jewish people." Mr. Creech further explained that he believed the Defendant's desire to have her children, and not the victim's daughter, inherit all of her property was a motive for the murder. Mr. Creech also stated that after the picture was shown at trial, "people went back and read [Psalm 69] at the hotel."

Based upon Mr. Creech's statements to the Defendant's private investigators, he was subpoenaed to testify at a post-trial hearing. Mr. Creech testified that the jurors did not prematurely deliberate during the trial. According to Mr. Creech, a juror who was eventually removed for an emergency made "passing comments" on two occasions. Mr. Creech recalled that she said, "This is crazy. This is a waste of time, and I don't see any evidence of guilt here." Mr. Creech testified that he did not believe that the juror "thought she was [intentionally] deliberating by her actions" but that the other jurors told her that they did not "need to be talking about this."

Mr. Creech brought her statements to the attention of the court officer, who told him that they should "self-police" and "be on guard for that." Mr. Creech testified that he never discussed the evidence with the other jurors during the trial. Furthermore, he testified that everything he told the Defendant's investigators about what the other members of the jury thought about the evidence was based upon his conversations with the jurors "after they came back to the hotel after the verdict was passed down."

Mr. Creech testified that during the trial, a picture of an open Bible found in the victim's bedroom was shown to the jury. Psalm 69 was featured prominently in the picture, but a pair of glasses obscured some of the text and a glasses case covered the very last line of the psalm. Mr. Creech testified that after the picture was shown at trial, he read Psalm 69 "as well as other passages" from the Bible in his hotel room. Mr. Creech further testified that he did not discuss Psalm 69 with the other jurors during the trial.

According to Mr. Creech, after the verdict was returned, he asked some of the jurors about the picture, and they said "it was an interesting piece of evidence." Mr. Creech clarified that he "assumed [] based on their answers" that they had read Psalm 69 or "knew what that was" but that he was not aware of any of the other jurors having "looked at [an]

unobstructed" version of Psalm 69. Mr. Creech testified that the last line of Psalm 69 was obscured but that "the majority of it [was] right there on the picture," including portions that stated that God's "people will live there and possess the land" and that "the descendants" of God's servants "will inherit it."

*A. Premature Deliberation*

Tennessee Rule of Evidence 606(b) provides that during an inquiry into the validity of a verdict,

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improeprly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

This court has previously held that post-verdict inquiries into whether a jury has prematurely deliberated are barred because premature deliberations do not involve extraneous prejudicial information or outside influence. State v. Frazier, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984); see also State v. Aldret, 509 S.E.2d 811, 815 n.5 (S.C. 1999) (citing Frazier for the proposition that Tennessee courts "disallow any inquiry into allegations of premature deliberations since such allegations do not involve an extraneous influence over the jury"). As such, the Defendant's inquiry into whether the jury deliberated prematurely was barred by Rule 606(b).

Furthermore, while he gave a somewhat confusing statement to the Defendant's investigators, Mr. Creech testified to the trial court that the jurors did not prematurely deliberate during the trial. Mr. Creech further testified that a single juror made a few "passing comments" that the State had failed to meet its burden of proof but that the other jurors told her that they did not "need to be talking about this." We do not expect perfection from jurors and "[n]o normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974) (quoting Winebrenner v. United States, 147 F.2d

322, 330 (8th Cir. 1945) (Woodrough, J. dissenting)). Accordingly, we conclude that this issue is without merit.

*B. Extraneous Prejudicial Information*

Both the United States and the Tennessee Constitutions entitle a defendant to a trial by an impartial jury. U.S. CONST. amend. VI; TENN. CONST. art. 1, § 9. To ensure this right, a jury must be "influenced only by legal and competent evidence produced during trial." State v. Hugueley, 185 S.W.3d 356, 377 (Tenn. 2006) (quoting State v. Lawson, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). However, a defendant is entitled to a fair trial, not a perfect trial, and our ultimate inquiry "is whether the jury that tried the case was actually fair and impartial." State v. Willie Calvin Taylor, Jr., No. W2011-00671-CCA-R3-CD, 2012 WL 2308088, at *6 (Tenn. Crim. App. June 18, 2012).

A new trial may be warranted when a jury has been exposed to extraneous prejudicial information. Carruthers v. State, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003). Furthermore, "when it has been shown that a juror was exposed to extraneous prejudicial information or subject to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." Walsh v. State, 166 S.W.3d 641, 647 (Tenn. 2005). Extraneous information is "information from a source outside the jury." Carruthers, 145 S.W.3d at 92 (citing Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990)). A jury's consideration of "facts not admitted in evidence" is an external influence that may "warrant a new trial if found to be prejudicial." Id.

Before a new trial will be warranted, the extraneous information must be determined to have been prejudicial. David Keen v. State, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258, at *31 (Tenn. Crim. App. June 5, 2006), perm. app. denied, (Tenn. Oct. 30, 2006). Rule 606(b) permits "juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative process is inadmissible." Walsh, 166 S.W.3d at 649. As such, we "may only determine prejudice from the content" of the alleged extraneous information. Keen, 2006 WL 1540258, at *31.

We begin by noting that the testimony and statements of Mr. Creech regarding the effect of Psalm 69 on him or other members of the jury were inadmissible pursuant to Rule 606(b). Generally, readings from the Bible that are not particular to the defendant, the victim, or the facts and legal issues of a case are not considered prejudicial extraneous information. Keen, 2006 WL 1540258 at *31. Here, the Defendant argues that the

references in Psalm 69 to "the descendants" of God's servants inheriting the land could be considered evidence of the Defendant's motive to murder the victim.

However, those references are not obstructed and are readable in the picture of the Bible that was introduced into evidence at trial with no objection from the Defendant. The only line of the psalm which was completely obscured was the last line, which states as follows: "and those who love his name shall live in it." Psalms 69:36 (NRSV). As such, we cannot conclude that the jury's possible exposure to an "unobstructed" version of Psalm 69 was prejudicial. See Keen, 2006 WL 1540258 at *32 (stating that a "finding of reversible prejudicial error cannot be based on a mere possibility that a juror was improperly influenced"). Furthermore, there was no evidence that any of the jurors besides Mr. Creech, the alternate juror, read Psalm 69 in its entirety. See Taylor, 2012 WL 2308088, at *7 (concluding that because "the only testimony on the record indicate[d] that the jury as a whole . . . was not exposed to extraneous information" the defendant was not entitled to a new trial). Accordingly, we conclude that this issue has no merit.

*IX. Alleged <u>Brady</u> Violation and Newly Discovered Evidence*

The Defendant contends that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that she is entitled to a new trial based upon this newly discovered evidence. According to the Defendant, after her trial, she received a statement from former KCSO Sergeant Steve Robinson that he was the first police officer to arrive at the victim's house and that he witnessed another officer remove the gun from the house. The State responds that there was no Brady violation because Sgt. Robinson's statement did not exist until after the Defendant's trial. The State further responds that a new trial is not warranted because Sgt. Robinson recanted his statement that another officer removed the gun from the house, and because Sgt. Robinson's statement that he was the first officer on the scene was not so crucial to the Defendant's guilt or innocence that its admission would have probably resulted in an acquittal.

After the Defendant's trial, Sgt. Robinson had a chance encounter with one of the Defendant's private investigators. As a result of their conversation, Sgt. Robinson signed an affidavit in which he stated that he and KCSO Officer Joe Preston were the first two officers to arrive at the victim's house on March 13, 2003, that he saw the Defendant come out of the house "screaming" that the victim had killed himself, and that he later saw Officer Preston come "out of the residence holding a weapon and confirmed that the victim was dead" before returning "inside the residence with the gun in his hand."

Sgt. Robinson later spoke with Det. Moyers about the affidavit and recanted his statement that Officer Preston removed the gun from the victim's house. Officer Preston told

Det. Moyers that Sgt. Amburn and Chief Lyon were already at the victim's house when he and Sgt. Robinson arrived. Officer Preston further stated that he and Sgt. Robinson "had nothing to do with" the investigation in this case and that they were only at the scene "for just a few minutes." Officer Preston told Det. Moyers that Sgt. Robinson's affidavit was "not true at all" and "a lie." Officer Preston stated that he briefly entered the house to check on Chief Lyon, but he did not enter the bedroom or touch anything inside the house.

Sgt. Robinson testified via telephone at a post-trial hearing on this matter. Sgt. Robinson testified that he had told the Defendant's private investigators that he and Officer Preston were "one of the first, if not the first, car to get there" and that they found the Defendant "outside of the house, very upset." Sgt. Robinson admitted that he told the investigators that he saw Officer Preston walk "out of the house with the weapon." Sgt. Robinson testified that the affidavit, at the time he signed it, represented his recollection of what happened on March 13, 2003.

However, Sgt. Robinson testified that after signing the affidavit, he "subsequently thought about" what happened on March 13, 2003, "a lot" and realized that he had "misremembered" what happened and that his "recollection was wrong." Sgt. Robinson testified that he never saw Officer Preston come "out of the house with the weapon." Sgt. Robinson further testified that Officer Preston was too good of a police officer to do something like move a possible murder weapon and that Officer Preston "absolutely did not do that."

Sgt. Robinson also testified that when he arrived at the house, the Defendant was "on the porch" and "extraordinarily upset." Sgt. Robinson could not recall if Sgt. Amburn was there and testified that he was "so focused on" the Defendant that he could not remember who any of the other responding officers were. Sgt. Robinson also did not recall the Defendant's coming out of the house screaming and was unsure why that was in his affidavit. Sgt. Robinson testified that he "obviously misremembered that." Sgt. Robinson admitted that his recollection of March 13, 2003, was "not that good." Sgt. Robinson testified that he never went into the victim's house that day.

## A. *Brady* Violation

As previously stated, in order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. Ferguson, 2 S.W.3d at 915. This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, the State is not required to disclose "information that the accused already possess or is able to obtain, or information which is not possessed by or under the control of

-39-

the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted).

The State is also not required "to seek out exculpatory evidence not already in its possession or in the possession of a governmental agency." Marshall, 845 S.W.2d at 233; see also State v. Brownell, 696 S.W.2d 362, 363 (Tenn. Crim. App. 1985) (noting that the "State is under no obligation to make an investigation, or to gather evidence, for the defendant"). Likewise, when "evidence does not exist the State cannot be charged with suppressing it." Brownell, 696 S.W.2d at 364. Additionally, there is no constitutional requirement that the State "make a complete and detailed accounting to the defense of all police investigatory work on a case." Johnson, 38 S.W.3d at 56 (quoting State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995)).

Sgt. Robinson's statements to the Defendant's private investigators and his affidavit did not exist until after the Defendant's trial. Sgt. Robinson's name did not appear on the crime scene log, and there is no evidence in the record that Sgt. Robinson ever made similar accusations prior to his conversation with the Defendant's investigators. As such, the State cannot be faulted for suppressing evidence which did not exist until after the Defendant's trial was completed. Instead, we examine whether the State committed a Brady violation by failing to disclose Sgt. Robinson's name to the Defendant.

We first note that Sgt. Robinson testified that he spoke with the Defendant at her house on March 13, 2003. Therefore, the Defendant should have been aware that Sgt. Robinson was one of the first police officers to respond to her 911 call, and the State cannot be faulted for failing to disclose information already in her possession. Nor does Brady require the State to "make a complete and detailed accounting" of the police investigation. Johnson, 38 S.W.3d at 56.

Sgt. Robinson was one of several officers to respond to the victim's house that day. Sgt. Robinson's name was not recorded on the crime scene log because he never entered the house and he was only at the scene for a short period of time. Additionally, Sgt. Robinson arrived at the victim's house with Officer Preston, and Officer Preston's name was on the crime scene log provided to the Defendant. Furthermore, as we will discuss more fully below, the proof established at the post-trial hearing showed that Sgt. Robinson possessed no exculpatory evidence. Accordingly, we conclude that the State did not commit a Brady violation by failing to provide the Defendant with Sgt. Robinson's name.

*B. Newly Discovered Evidence*

-40-

A new trial will be granted on the basis of newly discovered evidence only when a defendant has established the following: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)).  The decision to grant or deny a new trial on the basis of newly discovered evidence "rests within the sound discretion" of the trial court.  Id. at 117.

This court has previously held as follows:

> When it appears that the newly discovered evidence can have no other effect than to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness," the trial court should not order a new trial "unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow."

Caldwell, 977 S.W.2d at 117 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)).

Sgt. Robinson's statements that he and Officer Preston were the first officers to arrive at the victim's house and that the Defendant was "screaming" and "extraordinarily upset" would have no other effect than to contradict Sgt. Amburn's testimony at trial.  We cannot conclude that Sgt. Robinson's statements on these issues were "so strong and convincing that a different result at trial would necessarily follow."  In his testimony before the trial court, Sgt. Robinson contradicted the statements in his affidavit.  Sgt. Robinson testified that he was "one of the first, if not the first" officers to arrive and that he had did not recall the Defendant running out of the house screaming.  Furthermore, Officer Preston stated that Sgt. Amburn and Chief Lyon were already at the house when he and Sgt. Robinson arrived.  Additionally, although Sgt. Amburn testified that the Defendant initially was "motionless," after he touched her she became "very hysterical."  Accordingly, we do not believe that these minor contradictions would have necessarily resulted in a different result at trial.

In sworn testimony before the trial court, Sgt. Robinson recanted the statement in his affidavit that he witnessed Officer Preston remove the gun from the victim's house.  As such, the only newly discovered evidence supporting the Defendant's claim that Officer Preston removed the gun from the house is the now discredited affidavit.  Sgt. Robinson's affidavit by itself would be inadmissible at trial as hearsay.  See Tenn. R. Evid. 802.  Nor could the Defendant call Sgt. Robinson to testify at trial for the sole purpose of impeaching him with

his prior inconsistent statement. See Tenn. R. Evid. 607, Advisory Comm'n Cmts. (stating that "[d]ecisional law prohibits a lawyer from calling a witness-knowing the testimony will be adverse to the lawyer's position-solely to impeach that witness by an inconsistent statement").

More importantly, Sgt. Robinson's recantation of his statement and Officer Preston's vigorous denial that he removed the gun from the house call the validity of the affidavit into serious doubt. Sgt. Robinson testified at the post-trial hearing that his recollections in the affidavit were "wrong" and that his memory of March 13, 2003, was "not that good." As such, the Defendant has failed to meet her burden to show that the affidavit would likely change the result of the trial. Accordingly, we conclude that the trial court did not error in denying the Defendant's request for a new trial on the basis of newly discovered evidence.

### X. Thirteenth Juror

The Defendant contends that the trial court, by accepting the jury's guilty verdict, "abdicated" its role as the thirteenth juror. The Defendant argues that no "rational person, based on the evidence . . . could have possibly convicted [her] on the scant evidence presented in this case." Essentially, the Defendant raises this issue in an attempt to reargue her contentions on the sufficiency of the evidence. The State responds that the trial court expressly approved the jury's verdict in its written order denying the Defendant's motion for new trial; therefore, the trial court fulfilled its duties as the thirteenth juror.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)) (internal quotation marks omitted).

We "may presume that the trial court approved the verdict as the thirteenth juror" when it has overruled a motion for new trial without comment. Biggs, 218 S.W.3d at 653 (citing Carter, 896 S.W.2d at 122). It is only when "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duties as the thirteenth juror. Carter, 896 S.W.2d at 122.

Here, the trial court did more than simply deny the Defendant's motion for new trial without commit. The trial court reviewed the evidence as well as the applicable law and expressly approved the jury's verdict in its written order denying the motion. Therefore, the trial court fulfilled its duty as the thirteenth juror. The State is correct in its assertion that an allegation that the trial court "abdicated" its role as the thirteenth juror is not a proper vehicle to challenge the sufficiency of the convicting evidence. The mere fact that the trial court approved the jury's verdict which was adverse to the Defendant did not evidence that the trial court failed to fulfill its duty as the thirteenth juror. Accordingly we conclude that this issue is without merit.

In a one-sentence argument citing only to a news media article, the Defendant contends that Judge Richard Baumgartner could not fulfill his duty as the thirteenth juror because he was "under the influence of drugs." The Defendant has failed to make any argument to support this contention beyond the conclusory sentence included in her brief. The Defendant has also failed to supply any citations to the record or legal authorities to support this contention. As such, the Defendant has waived review of the issue in this court. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Furthermore, there is no evidence in the record before us that Judge Baumgartenr was intoxicated or incompetent at the time he approved the jury's verdict and denied the Defendant's motion for new trial. See State v. Manuel Haynes, No. W2009-00599-CCA-R3-CD, 2010 WL 2473298, at *10 (Tenn. Crim. App. June 17, 2010), perm. app. denied, (Tenn. Nov. 12, 2010) (concluding that a new trial was not warranted when, despite the defendant's argument to the contrary, there was "no proof in the record that any juror was intoxicated during the trial"). Likewise, a trial judge's misconduct outside the courtroom does not constitute structural constitutional error "when there is no showing or indication in the record that the trial judge's misconduct affected the trial proceedings." State v. Letalvis Cobbins, LeMaricus Davidson, and George Thomas, No. E2012-00448-SC-R10-DD, slip op. at 3 (Tenn. May 24, 2012) (order vacating grant of new trials for the defendants). Based upon the record before us, we conclude that this issue is without merit.

*XI. Cumulative Error*

The Defendant contends that, even if no single error requires a new trial, the cumulative effect of multiple errors mandates such action. The Defendant argues that there were several errors during the course of her second trial and that these errors deprived her of a "fair and meaningful defense." The State responds that there can be no cumulative error

-43-

because the Defendant "failed to prove a single basis for reversal and remand for a new trial."

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare." Id. Having discerned no error during the Defendant's second trial, there can be no cumulative error. Accordingly, we conclude that this issue is without merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE