FILED
04/06/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 6, 2016

**STATE OF TENNESSEE v. EDWARD SAMPLE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01736     W. Mark Ward, Judge**

---

**No. W2016-00175-CCA-R3-CD**

---

The defendant, Edward Sample, was convicted of the unauthorized use of a motor vehicle, attempted second degree murder, employing a firearm during the commission of attempted second degree murder, aggravated assault, intentionally evading arrest in a motor vehicle, and evading arrest. He was sentenced, respectively, to eleven months and twenty-nine days, twelve years, six years, six years, two years, and eleven months and twenty-nine days. The trial court found him to be a dangerous offender and ordered that all sentences be served consecutively, resulting in a total effective sentence of twenty-seven years, eleven months and twenty-eight days. On appeal, the defendant argues that the trial court erred by admitting into evidence a recording of his jailhouse phone call, by charging the jury regarding his admission against interest, and by enhancing his sentences and ordering that they be served consecutively. Additionally, he argues that double jeopardy results from his convictions for attempted second degree murder and employing a firearm during its commission and that the State's closing argument was improper. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Edward Sample.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Pamela D. Stark and Joshua Corman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The victim, Brian Green, testified that on April 4, 2012, the defendant carjacked his vehicle and shot at him several times as he ran from the scene. The victim said he had left McDonald's, where he was employed, around 1:00 a.m. and drove to his residence. As he got out of his vehicle, he was met by the armed defendant and another man. Ordered by the defendant to get into the trunk of the vehicle, he instead ran and was shot at several times by the defendant. When the victim reached his apartment, he told Ebony Walters, his girlfriend, what had happened. Since she earlier had obtained a domestic assault warrant against the victim, she suggested that they tell the police that the victim had been her brother, Latroy Walters, which they did.

The victim said that his brother, Akaia Scott, saw the stolen vehicle several days later and telephoned the police. Because of what occurred when officers arrested the defendant, the victim decided to tell them what actually had occurred when the vehicle was stolen. After viewing a photographic lineup, the victim identified the defendant as the one who had stolen his vehicle and shot at him.

Ebony Walters testified that she had suggested she and the victim tell police officers that her brother was the victim, so Mr. Green would not be arrested because of the domestic assault warrant. However, after Officer Josh Shearer was shot while trying to arrest the defendant, she suggested that the victim tell the police what actually had happened.

Akaia Scott testified that he owned the vehicle taken by the defendant, but the victim was allowed to use it because he had been making the monthly payments for it. Mr. Scott said that several days after the defendant had taken the vehicle, he saw it being driven by the defendant in a store parking lot. Mr. Scott said his own appearance was very similar to his brother, the victim, and the defendant looked at him and said, "I thought I killed you." When the defendant pointed a gun at him, Mr. Scott ran and jumped into a ditch. As he got out of the ditch, Mr. Scott flagged down a police car and told the officers what had happened and that the perpetrator had fled to the nearby Lantern Square Apartments. Mr. Scott subsequently identified the defendant from a series of photographs.

Angelina Triplett testified that, on April 4, 2012, she was driving home from college and saw a speeding gray car, being chased by the police, coming toward her. She stopped her car, and the gray car jumped the curb and wrecked in some bushes. She described the driver as African-American, with unusual hair, slender, and wearing baggy

clothes, which were falling off. He was holding up his pants with one hand and had a pistol in the other. A police officer ran into the bushes after him, and Ms. Triplett next heard several gunshots, which frightened her, so she drove to her apartment complex across the street.

Officer Matthew Morton testified that he had been employed by the Memphis Police Department ("MPD") for six years and, on April 4, 2012, was working the 2:00 p.m. to 10:00 p.m. shift. During that shift, as he and his partner, Officer Josh Shearer, were on James Road, they were flagged down by a man who said that he had been carjacked and that the thief had pointed a pistol at him and taken his car, a silver Chevrolet Impala. As the officers turned into a nearby apartment complex, they saw what appeared to be the victim's vehicle, which they were unsuccessful in stopping. The fleeing vehicle went into oncoming traffic and then crashed in a grassy area with trees. Officer Morton saw the defendant running and going into the woods. Officer Shearer chased the defendant on foot while Officer Morton checked to make certain no one else was in the vehicle. Officer Morton then ran in the direction the defendant had taken and heard a series of gunshots in "real quick succession." He yelled for his partner, and "for a very long time, it was just silence." Officer Morton described the scene:

> And then finally [Officer Shearer] said, I'm over here, I've been shot or I've been hit. And so I went over there and I saw the defendant on the ground and he was bleeding and there was a gun right next to him and so I moved the gun further away and then I saw [Officer Shearer], his uniform was torn right here, and so I . . . started taking his uniform off trying to see where he had been shot at.

Officer Morton saw that Officer Shearer was bleeding, "in shock," and "wouldn't let his gun go because he was so scared." The defendant was nearby, unconscious, handcuffed, and bleeding from the neck and head. After other officers arrived, Officer Shearer and the defendant were transported from the scene by ambulance.

Officer Josh Shearer testified that on April 4, 2012, he was employed by the MPD and assigned to the North Precinct. He and Officer Morton were in the car together when they were flagged down by a man who told them he had been carjacked. The man told the officers that the thief had driven his car to a nearby apartment complex, and the officers then went there. The officers located the stolen vehicle, and the driver, later identified as the defendant, looked at them and drove off at a high rate of speed. The officers activated their siren and blue lights and pursued the defendant's vehicle. They saw it in a field, with the defendant running away. Officer Shearer yelled to the defendant to stop, show his hands, and get on the ground. When Officer Shearer caught the defendant, they were in the woods, and both went to the ground. The defendant

-3-

repeatedly ignored the command that he show his hands to Officer Shearer, who holstered his pistol to try and control the defendant's hands. The defendant then rolled over and shot Officer Shearer once in the chest, with the second shot striking his baton in its holster. Officer Shearer shot at the defendant, who continued fighting him, and was able to grab the defendant's pistol and throw it aside. Officer Shearer then used his pistol to twice strike the defendant's head and then shot him a second time. The defendant was trying to take away Officer Shearer's pistol.

Officer Eric Carlisle testified that he was employed by the MPD as a crime scene investigator and had responded to the shooting call. He secured from the scene a .40 caliber shell casing, a .380 shell casing, and a .380 handgun.

Special Agent Eric Warren, a forensic scientist with the Tennessee Bureau of Investigation, testified that, in his opinion, the .380 pistol recovered from the crime scene had fired the bullet fragment found at the scene. Officer Sam Blue, a crime scene investigator for the MPD, testified that he had taken photographs of the scene and that the photograph of Officer Shearer's bulletproof vest showed a bullet hole. Shelby County Sheriff's Deputy Elvin Holmes testified that, when the defendant entered the jail, he was assigned a RNI number to use in making telephone calls. Sonia Rogers, employed by the Shelby County Sheriff's Office as a fingerprint technician, said that she had matched the defendant's fingerprints with those for the RNI number assigned to him. Officer James Smith, a MPD crime scene officer, testified that he had lifted a fingerprint from the trunk of the stolen vehicle. Robert Winston, a latent print examiner for the MPD Crime Scene Investigations Unit, testified that the print matched that of the defendant.

Lieutenant Anthony Mullins of the MPD testified that the bulletproof vest and shirt worn by Officer Shearer had gunshot residue at the neck and midsection, as well as at a bullet hole on the edge of the vest.

After he was released from the hospital, the defendant spoke with Officers Kevin Williams, Isreal Taylor, and Brian Beasley and denied that he had carjacked the vehicle, explaining that an individual named "Cut Throat" had given it to him earlier in the day. The defendant recalled that he fled from the police and was carrying a .380 pistol as he ran from the vehicle. He said that Officer Shearer had jumped on his back and that he had tried to fire Officer Shearer's pistol, but he was unable to do so.

Anthony Washington, the defendant's brother, testified that he could not remember any statement he made to Officer Taylor. Officer Taylor testified that Mr. Washington had told him that the defendant had been driving the vehicle for several days.

Officer Brian Beasley testified that, after he had taken the original car theft report, the victim and the others he had interviewed came to the police station and admitted they had not told the truth regarding the ownership of the vehicle. Officer Beasley listened to the recording of the jailhouse telephone call and identified the defendant's voice.

Following this testimony, the State rested, as did the defendant.

## ANALYSIS

We will review the issues raised on appeal by the defendant.

### I. Recording of Defendant's Jailhouse Telephone Call

The defendant argues that the trial court erred by allowing into evidence a portion of a telephone call he made from the Shelby County Jail, during which he discussed the carjacking and homicide charges against him and told of his plan to act "retarded" during the trial. As for the legal bases for this argument, the defendant asserts that the State failed to prove that the defendant's statement was made voluntarily and that the statement was prejudicial because of profane and derogatory statements made by the defendant during the call.

We note that the recording of the call played for the jury is not in the record on appeal. The State argues that this issue is waived for that reason, as well as the fact that the legal arguments presented on appeal as to this issue were not raised either at trial or in the motion for new trial.

The only evidence in the record regarding the contents of the telephone call comes from a summary of the conversation given by the State to the trial court after the recording had been played:

> That's the extent of it. I don't know if Your Honor was able to hear it. I can play it again louder, but what the State is saying that it says is that first [the defendant is] talking about acting retarded. And I think he even says he was going to shit on himself in the courtroom and look all cockeyed and do anything he could to beat it. He says check his charges. He's asking about the carjacking. He heard it had been dropped. And his brother replies, no, you don't have no [sic] carjacking. And he seems very surprised and excited about that. He then details the charges that he has left. And I think that's actually when he starts talking about how he's going to act retarded and do anything he can to beat this. And then he starts talking about the dropping of the criminal attempt murder to manslaughter

-5-

or voluntary manslaughter, which is when his brother replies, yes, it will probably be dropped to criminal attempt manslaughter because the officer shot back. And he says, I know, right? And that's the part we're wanting to get in.

Arguing that the conversation should not have been admitted into evidence, defense counsel, at trial, contended that his "concern would be for one, the language that they're using, the defendant's tone in that conversation, I believe is prejudicial. This is a situation where you can make various interpretations of the nature . . . of their conversation, and I don't think it's appropriate to allow them to do that." Further, defense counsel was "concern[ed] because it's obvious that the call is coming from jail." Counsel argued that the jury would not know if the defendant was in custody as a result of the case being tried or another case. Additionally, counsel argued that "the tone, the slang, profanity, things of that nature . . . put the defendant in a bad light."

The trial court found no merit to the defendant's arguments:

> I don't think it's inadmissible under [Tennessee Rule of Evidence] 404(b) because it's not proof of another crime. I do think it's relevant to this proceeding. It actually falls within the area of activity to evade, . . . showing consciousness of guilt. I do think it's relevant.

> As far as being in jail, . . . I don't think that in and of itself keeps relevant evidence from coming in just because normally we try not to tell people that they're in jail. This one I think is admissible.

The defendant argues on appeal that the trial court erred in concluding that his jailhouse phone call was an adoptive admission. Further, he argues that "the voluntariness of a confession is a question of fact" and that, at a pretrial hearing, "the State never gave any context surrounding the jail call, nor did the trial court require the State to prove the voluntariness of [the] [d]efendant's statement." The problem is that the defendant has abandoned the arguments he made to the trial court and in his motion for new trial and has presented entirely new arguments on appeal. As our supreme court explained in State v. Leach, 148 S.W.3d 42 (Tenn. 2004), "[a]s a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." Id. at 55 (citing Johnson v. State, 38 S.W.3d 52, 60 n.8 (Tenn. 2001)). Accordingly, this issue is waived. As an additional ground for waiver, we conclude, as well, that because the appellate record includes neither a recording of the defendant's telephone conversation nor a transcript of it, the record is insufficient for us to consider the issue. See Tenn. R. App. P. 25(g).

-6-

## II. Jury Instruction Regarding Confession and Corroborating Evidence

On appeal, the defendant argues that the trial court did not properly instruct the jury as to whether he could be convicted based solely upon a confession or admission. The State responds that the defendant's claim is untimely because, although the trial court advised the parties during the trial, at length, as to the instructions to the jury, the defendant did not object to the charge until his motion for new trial. We will review this issue.

At the conclusion of the trial, the court instructed the jury as follows as to how a confession or admission of the defendant should be viewed:

> Evidence has been introduced in this trial of a statement or statements by the defendant made outside the trial to show a confession and/or admission against interest.

> A confession is a statement by the defendant that he committed the crime charged.

> An admission against interest is a statement by the defendant which acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of the defendant or is evidence of some material fact but not amounting to a confession.

> While this evidence has been received it remains your duty to decide if in fact such statement was ever made.

> If you believe a statement was not made by the defendant, you should not consider it.

> If you decide the statement was made by the defendant, you must judge the truth of the facts stated.

> In so determining, consider the circumstances under which the statement was made.

> Also, consider whether any of the other evidence before you tends to contradict the statement in whole or in part.

You must not however arbitrarily disregard any part of any statement but rather should consider all of any statement you believe was made and is true.

You are the sole judge of what weight should be given [to] such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining the defendant's guilt or innocence.

As the State correctly points out, the jury instructions were provided to counsel prior to being read to the jurors, and defense counsel neither in writing nor orally objected to the language regarding confessions or admissions, which is the subject of this assignment of error.

For two reasons, we conclude that this assignment of error is without merit. First, Tennessee Rule of Criminal Procedure 30(a) was interpreted by State v. Leath, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013), as requiring that motions regarding jury instructions be in writing and submitted to the trial court. The defendant did not file such a motion. Further, in State v. Christopher Lee Byrge, No. E2015-00014-CCA-R3-CD, 2015 WL 7824325 (Tenn. Crim. App. Dec. 3, 2015), perm. app. denied (Tenn. May 6, 2016), as in the present appeal, the defendant argued that the trial court should have instructed the jury that "an admission is not sufficient in itself to support a conviction." Id. at *9.

This court explained why such an instruction was not necessary:

Based on our analysis in [State v.] Jimmy Dale Pickett, [No. M2005-02434-CCA-R3-CD, 2007 WL 471136, at *12 (Tenn. Crim. App. Feb. 4, 2007),] we conclude that Section 42.11 of the TPI, as charged in this case, is an adequate and accurate statement of the law on admissions. Although the language of Section 42.11 for admissions differs slightly from Section 42.12 for confessions, the substance of both instructions is effectively the same. The trial court's jury instruction advised the jury to consider Defendant's admissions along with all other evidence in the case when determining the veracity of the admissions as well as the degree of weight to give the admissions in determining guilt or innocence. As such, we cannot say that the trial court erred in refusing Defendant's request. He is not entitled to relief on this issue.

Id. at *11.

-8-

This issue is without merit.

### III. Double Jeopardy Claims

The defendant argues that his convictions for attempted second degree murder and employing a firearm while committing that offense constitute double jeopardy.

After the defendant's brief was filed in this matter, our supreme court considered in State v. Martin, 505 S.W.3d 492, 511 (Tenn. 2016), the same arguments raised in the present appeal and concluded that they were without merit. In Martin, the defendant argued that his convictions for carjacking and employment of a firearm during the commission of the carjacking violated the prohibitions against double jeopardy. The court explained the intent of the legislature in the statutory language regarding such multiple convictions:

> Here, Tennessee Code Annotated section 39-17-1324 contains clear indications of legislative intent to permit multiple punishments. Subsection (d) of that statute states: "A violation of subsection . . . (b) is a specific and *separate offense*, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony." Tenn. Code Ann. § 39-17-1324(d) (emphasis added). Subsection (e) of the statute likewise contains an explicit expression of legislative intent to permit multiple punishments: "A sentence imposed for a violation of subsection . . . (b) *shall be served consecutive to any other sentence* the person . . . is sentenced to serve for conviction of the underlying dangerous felony." Tenn. Code Ann. § 39-17-1324(e)(1) (emphasis added). Thus, the statute contains clear indications that the legislature intended to permit separate punishments for the firearm offense and for the underlying dangerous felony. [State v.] Watkins, 362 S.W.3d [530], 545 [(Tenn. 2012)].

Id. at 510.

The court then explained why the dual convictions did not violate the defendant's right against double jeopardy:

> A court applying the Blockburger [v. United States, 284 U.S. 299 (1932)] test must examine the elements of the charged offenses in the abstract, as they are stated in the pertinent statutes, without regard to the specific facts in a given case. State v. Cross, 362 S.W.3d 512, 520 (Tenn. 2012). The fact that a firearm was the means of accomplishing the force or intimidation

-9-

does not transform the use of the firearm into an essential element of the carjacking offense if the indictment charged carjacking "by force or intimidation." See Garrett v. State, No. W2012-01994-CCA-R3-PC, 2014 WL 1410292, at *5-7 (Tenn. Crim. App. Apr. 10, 2014) (concluding that dual convictions for carjacking by force or intimidation and employing a firearm during the commission of a dangerous felony do not constitute double jeopardy); see also Thomas v. State, No. W2012-01646-CCA-R3-PC, 2013 WL 5761398 (Tenn. Crim. App. June 28, 2013) (making a similar finding).

Id. at 510-11.

Applying the holding in Martin, we conclude that the defendant's convictions for attempted second degree murder and employment of a firearm during that offense do not violate the prohibitions against double jeopardy and may stand.

## IV. Sentencing

The defendant argues both that the trial court erred in setting the length of the sentences and ordering that they be served consecutively.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

-10-

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

We note first, as the State correctly points out in its brief, although the presentence report was entered as an exhibit during the hearing, it is not included in the record on appeal. However, the record is sufficient for this court to consider the issue.

In sentencing the defendant, the trial court noted that there were no mitigating circumstances or acceptance of responsibility, although the presentence report reflected that the defendant had spoken of remorse and that the court would credit him for that. As for the defendant's rehabilitation potential, the trial court determined that the defendant had an "extensive juvenile record" and had been issued at least nine write-ups while incarcerated. The court also described the "long history of efforts to rehabilitate [the defendant], even though he is so young and no success." Further, the court noted that, according to the presentence report, the defendant was a member of the Crips street gang. Accordingly, the court imposed the maximum sentences for each conviction because of the defendant's repeatedly failed efforts at rehabilitation.

As to whether the defendant qualified as a dangerous offender, the court reviewed the facts of the crimes committed by the defendant:

First, this whole process starts with a car-jacking and I do find by the preponderance of the evidence the defendant did commit a car-jacking. Significantly in that car-jacking, he wanted to do more than car-jacking, he ordered the victim to get into the trunk, which would have been, if the victim had gotten into the trunk, . . . it would have been, at least, an especially aggravated kidnapping, . . . if not a homicide. You just ordering somebody into the trunk of a car is not an essential element, or a part of a car-jacking, it makes it an aggravated situation.

-11-

And then the victim decides not to get in, he takes off running and . . . multiple shots were fired at the victim as he ran away. One witness said as many as five times, but at least, multiple shots, at least more than one was fired.

So now, if he's got good aim he's committed a felony murder. If his aim was a little better he would be in life in prison.

Again, actually firing multiple shots at the victim of a car-jacking aggravates the situation beyond just your typical car-jacking. Of course, he also puts the gun in the face of that man. That's all he had to do, but he didn't have to fire the shots. Of course, more than one person was involved and I know criminal responsibility may be involved in this.

Then, he goes to the second victim in the one that we are talking about, he points a gun at him and says, "I thought I killed you, already". And, "I know where your girlfriend lives". And threatens him.

Again, this pointing the gun was all that was necessary . . . and threatening the girlfriend is not necessary. And then we get to the actual one where he's chased in a high speed chase in a car, then runs on foot from the police officer and then takes two shots, so attempted second degree murder, takes two shots, actually hits the policeman at point blank range, after tricking him into holstering his gun, by falling on the ground with his hands down and then turning over and shooting him. I again think that that aggravates the situation, beyond the normal attempted second degree murder.

And then when I look at this whole context of this, these crimes being committed - I am sentencing him for one, two, three, four, five – I'll just count it as five different crimes, all in context together, I think when you consider them all together it also aggravates the situation.

So you can attempt to commit second degree murder, you don't have to shoot somebody in the point blank chest, a police officer, by tricking him into holstering his weapon, I just think that it is an aggravated situation, I think.

And then, when you . . . add to that, . . . by a preponderance of the evidence I find that he committed another aggravated robbery and

-12-

attempted another two other aggravated assaults. He is a member of the Crips, with a long history of efforts at rehabilitation and then goes off to the penitentiary and has nine write ups. I mean, he is the worst of the worst, he is the kind that we need to be protecting ourselves against.

So I am going to order consecutive sentencing on all of these.

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that any one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies. We review the trial court's consecutive sentencing determinations for an abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying same deferential standard announced in Bise, 380 S.W.3d 682, to the trial court's consecutive sentencing decisions).

When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

The trial court's recitation of the facts made very clear the danger which this defendant poses for society. The record easily supports the sentencing determinations of the trial court.

### V. State's Closing Argument

On appeal, the defendant argues that the State committed reversible error by comments made during its closing argument.

During the defendant's closing argument, counsel argued, regarding the portion of the defendant's telephone call which had been played for the jury, that it "wasn't a full call, but it sounds as if there was laughing and joking going on." Continuing, counsel argued that in listening to only a portion of the conversation, "you never can get the full story, the impression I got, the one thing we do know is they knew it was being recorded." In the State's closing argument regarding the carjacking indictment, the State asserted that when the defendant was confronted by the owner of the stolen vehicle, the defendant did not walk away from the vehicle "because he knew he was good for the carjacking . . . and he committed it and he was going to do anything necessary." Continuing with this argument, the State reminded the jury of the defendant's recorded

telephone call: "And I want you to listen to this jail phone call. I know it's been said it's a snippet. Obviously you have seen at this point that everybody has access to everything and any other portion of it could have been admitted just as well by either party." Defense counsel then objected: "Stuff that's not in evidence, what [the State] just said, everybody had access to everything and anything could have been admitted, that's definitely not in evidence from this trial which is what [the State is] limited to on closing."

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; or intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. Id. at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

In his brief, the defendant explains his trial objection, saying that the State's argument assumed facts not in evidence, presumably by its statement that any other portion of the defendant's jailhouse telephone call could have been entered into evidence by either of the parties. After the defendant argued that the jury had heard only a "snippet" of the phone call, which may have been misleading, the State responded that, had the defendant desired, he could have played the entire recording for the jury. We do not understand how the defendant derives from this statement and response his appellate claims that the State expressed a personal opinion as to the guilt of the defendant or that

the State was arguing facts outside the record.  Further, because the defendant was found not guilty of the carjacking charge, we cannot envision how the allegedly improper argument by the State prejudiced the defendant.  Accordingly, this assignment is without merit.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE